APPEAL,CLOSED

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:14−cv−01966−BAH</u>

ARPAIO v. OBAMA et al
Assigned to: Judge Beryl A. Howell
Cause: 05:551 Administrative Procedure Act

Date Filed: 11/20/2014
Date Terminated: 12/24/2014
Jury Demand: None
Nature of Suit: 899 Administrative
Procedure Act/Review or Appeal of
Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**JOSEPH M. ARPAIO**

represented by  **Larry E. Klayman**
LAW OFFICES OF LARRY KLAYMAN
2020 Pennsylvania Avenue, NW
Suite 345
Washington, DC 20006
(310) 595−0800
Fax: (310) 275−3276
Email: leklayman@gmail.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**BARACK OBAMA**

represented by  **Adam D. Kirschner**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 353−9265
Email: adam.kirschner@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kathleen Roberta Hartnett**
UNITED STATES DEPARTMENT OF
JUSTICE
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
(202) 514−2331
Fax: (202) 514−8071
Email: kathleen.r.hartnett@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**JEH CHARLES JOHNSON**                    represented by  **Adam D. Kirschner**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Kathleen Roberta Hartnett**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**LEON RODRIQUEZ**                         represented by  **Adam D. Kirschner**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Kathleen Roberta Hartnett**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**ERIC HOLDER, JR.**                       represented by  **Adam D. Kirschner**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Kathleen Roberta Hartnett**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 11/20/2014 | 1 | | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0090−3912973) filed by JOSEPH M. ARPAIO. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Civil Cover Sheet, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons)(Klayman, Larry) (Entered: 11/20/2014) |
| 11/20/2014 | | | Case Assigned to Judge Beryl A. Howell. (sth, ) (Entered: 11/21/2014) |
| 11/21/2014 | 2 | | SUMMONS (4) Issued Electronically as to ERIC HOLDER, JR., JEH CHARLES JOHNSON, BARACK OBAMA, LEON RODRIQUEZ. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons)(sth, ) (Entered: 11/21/2014) |
| 11/21/2014 | 3 | | STANDING ORDER. Signed by Judge Beryl A. Howell on November 21, 2014. (lcbah2) (Entered: 11/21/2014) |
| 11/24/2014 | | | MINUTE ORDER (paperless) DIRECTING the plaintiff to comply with Local Civil Rule 65.1, which requires applications for preliminary injunctions and temporary restraining orders to be made in a motion "separate from the |

| | | | |
|---|---|---|---|
| | | | complaint," if the plaintiff intends to seek such extraordinary relief. Signed by Judge Beryl A. Howell on November 24, 2014. (lcbah2) (Entered: 11/24/2014) |
| 11/24/2014 | 4 | | REQUEST FOR SUMMONS TO ISSUE by JOSEPH M. ARPAIO re 1 Complaint, filed by JOSEPH M. ARPAIO. Related document: 1 Complaint, filed by JOSEPH M. ARPAIO. (Attachments: # 1 Summons)(Klayman, Larry) (Entered: 11/24/2014) |
| 11/25/2014 | 5 | | SUMMONS (2) Issued Electronically as to ERIC HOLDER, JR., BARACK OBAMA, U.S. Attorney and U.S. Attorney General (jf, ) (Entered: 11/25/2014) |
| 12/04/2014 | 6 | | MOTION for Preliminary Injunction by JOSEPH M. ARPAIO (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L)(Klayman, Larry) (Entered: 12/04/2014) |
| 12/04/2014 | 7 | | MOTION for Preliminary Injunction by JOSEPH M. ARPAIO (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L)(Klayman, Larry) (Entered: 12/04/2014) |
| 12/04/2014 | 8 | | ORDER Controlling Preliminary Injunction Proceedings. The plaintiff shall, by 5:00 p.m. on December 9, 2014, submit (1) proof of service of the 1 Complaint and 6 Motion for Preliminary Injunction; and (2) a joint proposed schedule to govern the preliminary injunction proceedings. See Order for further details. Signed by Judge Beryl A. Howell on December 1, 2014. (lcbah2) (Entered: 12/04/2014) |
| 12/04/2014 | | | Set/Reset Deadlines: Response to Order of the Court due by 5:00 PM on 12/9/2014. (tg, ) (Entered: 12/04/2014) |
| 12/05/2014 | 9 | | NOTICE *Praecipe* by JOSEPH M. ARPAIO re 8 Order, (Attachments: # 1 Exhibit 1)(Klayman, Larry) (Entered: 12/05/2014) |
| 12/06/2014 | 10 | | NOTICE of Appearance by Adam D. Kirschner on behalf of All Defendants (Kirschner, Adam) (Entered: 12/06/2014) |
| 12/06/2014 | 11 | | RESPONSE re 9 Notice (Other) filed by ERIC HOLDER, JR., JEH CHARLES JOHNSON, BARACK OBAMA, LEON RODRIQUEZ. (Kirschner, Adam) (Entered: 12/06/2014) |
| 12/09/2014 | 12 | | RESPONSE TO ORDER OF THE COURT re 8 Order, filed by JOSEPH M. ARPAIO. (Klayman, Larry) (Entered: 12/09/2014) |
| 12/10/2014 | | | MINUTE ORDER (paperless) ISSUING the following SCHEDULING ORDER to control the timing and consideration of the plaintiff's motion for a preliminary injunction. The plaintiff's 12 Statement on Briefing Scheduling of Motion for Preliminary Injunction indicates that the parties have been unable to agree to a joint briefing schedule and, consequently, under LCvR 65.1, "[t]he opposition shall be served and filed within seven days after service of the application for preliminary injunction." LCvR 65.1 does not provide for the submission of a reply brief. Accordingly, the defendants are directed to file their opposition, including any objections based on "the significant jurisdictional issues raised by plaintiff's lawsuit," to the plaintiff's 6 Motion for Preliminary Injunction and Request for Oral Argument Thereon by December 15, 2014. The parties shall appear on December 22, 2014 at 9:30 AM, in Courtroom 15, for a hearing |

| | | |
|---|---|---|
| | | regarding the plaintiff's 6 Motion for Preliminary Injunction and Request for Oral Argument Thereon. Signed by Judge Beryl A. Howell on December 10, 2014. (lcbah2) (Entered: 12/10/2014) |
| 12/10/2014 | | Set/Reset Deadlines/Hearings: Opposition to 6 Motion for Preliminary Injunction and Request for Oral Argument Thereon due by 12/15/2014. Hearing on the Motion for Preliminary Injunction scheduled for 12/22/2014 at 9:30 AM in Courtroom 15 before Judge Beryl A. Howell. (tg, ) (Entered: 12/10/2014) |
| 12/15/2014 | 13 | Memorandum in opposition to re 7 MOTION for Preliminary Injunction , 6 MOTION for Preliminary Injunction filed by ERIC HOLDER, JR., JEH CHARLES JOHNSON, BARACK OBAMA, LEON RODRIQUEZ. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Text of Proposed Order)(Kirschner, Adam) (Entered: 12/15/2014) |
| 12/16/2014 | | MINUTE ORDER (paperless) TO SHOW CAUSE why the defendants' 13 Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Preliminary Injunction ("Defs.' Opposition") should not be construed as a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The defendants shall file a notice with the Court by 12:00 PM on December 17, 2014 explaining whether their opposition should be construed as a motion to dismiss under Rule 12(b)(1). The plaintiff may file a reply in light of the issues raised by Defs.' Opposition by 5:00 PM on December 18, 2014. Signed by Judge Beryl A. Howell on December 16, 2014. (lcbah2) (Entered: 12/16/2014) |
| 12/16/2014 | | Set/Reset Deadlines: Response to Show Cause due by 12:00 PM on 12/17/2014; Reply due by 5:00 PM on 12/18/2014. (tg, ) (Entered: 12/16/2014) |
| 12/16/2014 | 14 | NOTICE OF SUPPLEMENTAL AUTHORITY by JOSEPH M. ARPAIO (Attachments: # 1 Exhibit 1)(Klayman, Larry) (Entered: 12/16/2014) |
| 12/17/2014 | 15 | NOTICE *re Minute Order* by ERIC HOLDER, JR., JEH CHARLES JOHNSON, BARACK OBAMA, LEON RODRIQUEZ re Order,, (Kirschner, Adam) (Entered: 12/17/2014) |
| 12/17/2014 | 16 | Unopposed MOTION for Extension of Time to File *Reply* by JOSEPH M. ARPAIO (Klayman, Larry) (Entered: 12/17/2014) |
| 12/17/2014 | 17 | NOTICE *of Filing of Request for Live Testimony* by JOSEPH M. ARPAIO re 7 MOTION for Preliminary Injunction (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Klayman, Larry) (Entered: 12/17/2014) |
| 12/18/2014 | | MINUTE ORDER (paperless) GRANTING the plaintiff's 16 Unopposed Motion for Extension of Time to File Reply. The plaintiff shall have until 8:00 PM on December 18, 2014 to file his reply. The plaintiff's 17 Request for Live Testimony is DENIED as the testimony will result in the "needless presentation of cumulative evidence," *see* LCvR 65(1)(d), since, at this stage of the proceedings, in opposition to the defendants' motion to dismiss, the Court need not make any credibility determinations and must accept as true the factual allegations made by the plaintiff. Any evidence the plaintiff wished the Court to |

|  |  |  | hear by live testimony may be presented instead in a sworn declaration supplementing the plaintiff's previous declaration. *See* Decl. of Sheriff Joe Arpaio, Ex. G, ECF No. 6 . Accordingly, the plaintiff has leave to file a supplemental declaration setting forth those facts the plaintiff would have otherwise presented during live testimony by 5:00 PM on December 19, 2014. Signed by Judge Beryl A. Howell on December 18, 2014. (lcbah2) (Entered: 12/18/2014) |
| 12/18/2014 |  |  | Set/Reset Deadlines: Plaintiff's Reply due by 8:00 PM on 12/18/2014. Plaintiff's Sworn Supplemental Declaration due by 5:00 PM on 12/19/2014. (tg, ) (Entered: 12/18/2014) |
| 12/18/2014 | 18 |  | Unopposed MOTION to Increase Page Limit re Order,, by JOSEPH M. ARPAIO (Klayman, Larry) (Entered: 12/18/2014) |
| 12/18/2014 |  |  | MINUTE ORDER (paperless) GRANTING the plaintiff's 18 Unopposed Motion to Increase Page Limit. The plaintiff shall have an additional fifteen pages for his Reply. Signed by Judge Beryl A. Howell on December 18, 2014. (lcbah2) (Entered: 12/18/2014) |
| 12/18/2014 | 19 |  | REPLY to opposition to motion re 7 MOTION for Preliminary Injunction filed by JOSEPH M. ARPAIO. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Klayman, Larry) (Entered: 12/18/2014) |
| 12/19/2014 | 20 |  | NOTICE *of Filing of Supplemental Declaration of Sheriff Joe Arpaio, in Support of Plaintiffs Motion for Injunction* by JOSEPH M. ARPAIO re Order on Motion for Extension of Time to File,,,, (Attachments: # 1 Declaration of Sheriff Joe Arpaio, In Support of Plaintiff's Motion for Injunction)(Klayman, Larry) (Entered: 12/19/2014) |
| 12/21/2014 | 21 |  | NOTICE *of Filing of Document to be Included as Part of Exhibit 5* by JOSEPH M. ARPAIO re 20 Notice (Other), (Attachments: # 1 Exhibit)(Klayman, Larry) (Entered: 12/21/2014) |
| 12/21/2014 | 22 |  | NOTICE of Appearance by Kathleen Roberta Hartnett on behalf of All Defendants (Hartnett, Kathleen) (Entered: 12/21/2014) |
| 12/22/2014 |  |  | Minute Entry for proceedings held before Judge Beryl A. Howell: Hearing on a Motion for Preliminary Injunction held on 12/22/2014. (Court Reporter Barbara DeVico.) (tg, ) (Entered: 12/22/2014) |
| 12/23/2014 | 23 | 47 | MEMORANDUM OPINION regarding the plaintiff's 6 , 7 Motion for Preliminary Injunction and the defendants' Motion to Dismiss for lack of subject matter jurisdiction. Signed by Judge Beryl A. Howell on December 23, 2014. (lcbah3) (Entered: 12/23/2014) |
| 12/23/2014 | 24 | 45 | ORDER GRANTING the defendants' Motion to Dismiss for lack of subject matter jurisdiction and DENYING the plaintiff's 6 , 7 Motion for Preliminary Injunction. The Clerk of the Court is directed to close the case. See Order for further details. Signed by Judge Beryl A. Howell on December 23, 2014. (lcbah3) (Entered: 12/23/2014) |
| 12/23/2014 | 25 | 6 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 23 Memorandum & Opinion, 24 Order, by JOSEPH M. ARPAIO. Filing fee $ 505, receipt number 0090−3945815. Fee Status: Fee Paid. Parties have been notified. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Klayman, Larry) (Entered: 12/23/2014) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSEPH ARPAIO,

|                    Plaintiff,

|        v.

BARACK OBAMA, ET AL.                          Case 1:14-cv-01966

|                    Defendants.

---

### NOTICE OF APPEAL

NOTICE is hereby given that Plaintiff Joseph Arpaio appeals to the U.S. Court of

Appeals for the District of Columbia Circuit from the Memorandum Opinion and Order of this

Court entered on December 23, 2014 (Docket Nos. 23, 24)(Exhibits 1, 2), which granted

Defendants' Motion to Dismiss, dismissed all claims, and denied Plaintiff's Motion for

Preliminary Injunction; and all other orders and rulings adverse to Plaintiff in this case.

Dated: December 23, 2014

Respectfully submitted,


  /s/ *Larry Klayman*
Larry Klayman, Esq.
D.C. Bar No. 334581
Klayman Law Firm
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 23rd day of December, 2014 a true and correct copy of the foregoing Notice of Appeal (Civil Action Nos. 14-cv-1966) was submitted electronically to the District Court for the District of Columbia and served via CM/ECF upon the following:

> ADAM D. KIRSCHNER
> Trial Attorney
> Civil Division, Federal Programs Branch
> U.S. Department of Justice
> P.O. Box 883
> Washington, D.C. 20044
> Tel.: (202) 353-9265
> Fax: (202) 616-8470
> Adam.Kirschner@usdoj.gov
> *Attorney for Defendants*

> Respectfully submitted,


>  /s/ *Larry Klayman*
> Larry Klayman, Esq.
> D.C. Bar No. 334581
> 2020 Pennsylvania Ave. NW, Suite 345
> Washington, DC 20006
> Tel: (310) 595-0800

# Exhibit 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSEPH ARPAIO,<br><br>              Plaintiff,<br><br>              v.<br><br>BARACK H. OBAMA, *President, United States in his official capacity, et al.*,<br><br>              Defendant. | Civil Action No. 14-01966 (BAH)<br><br>Judge Beryl A. Howell |

## MEMORANDUM OPINION

The plaintiff, the elected Sheriff of Maricopa County, brings suit against the President of the United States, and other Federal officials, alleging that certain immigration policies announced by the President in a nationwide address on November 20, 2014 are unconstitutional, otherwise illegal, and should be stopped from going into effect.  *See* Pl.'s Mot. Prelim. Inj. ("Pl.'s Mot."), ECF No. 7.  The plaintiff's suit raises important questions regarding the nation's immigration policies, which affect the lives of millions of individuals and their families.  The wisdom and legality of these policies deserve careful and reasoned consideration.  As the Supreme Court recently explained: "[T]he sound exercise of national power over immigration depends on the [Nation] meeting its responsibility to base its law on a political will informed by searching, thoughtful, rational civic discourse."  *Arizona v. United States*, 132 S.Ct. 2492, 2510 (2012).

The key question in this case, however, concerns the appropriate forum for *where* this national conversation should occur.  The doctrine of standing, in both its constitutional and prudential formulations, concerns itself with "'the proper—and properly limited—role of the courts in a democratic society.'"  *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Warth v.*

*Seldin*, 422 U.S. 490, 498 (1975)).  Standing "ensures that [courts] act as judges, and do not engage in policymaking properly left to elected representatives." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2659 (2013).

The refusal to adjudicate a claim should not be confused with abdicating the responsibility of judicial review.  "Proper regard for the complex nature of our constitutional structure requires neither that the Judicial Branch shrink from a confrontation with the other two coequal branches of the Federal Government, nor that it hospitably accept for adjudication claims of constitutional violation by other branches of government where the claimant has not suffered cognizable injury." *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 474 (1982).  A court must refrain "'from passing upon the constitutionality of an act [of the representative branches], unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it.'" *Id.* (quoting *Blair v. United States*, 250 U.S. 273, 279 (1919)) (alteration in original).  Ultimately, "[i]t is the role of courts to provide relief to claimants . . . who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996).

Concerns over the judicial role are heightened when the issue before the court involves, as here, enforcement of the immigration laws.  This subject raises the stakes of, among other factors, "immediate human concerns" and "policy choices that bear on this Nation's international relations." *Arizona v. United States*, 132 S.Ct. at 2499.  "[O]ur Constitution places such sensitive immigration and economic judgments squarely in the hands of the Political Branches, not the courts." *Fogo de Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127,

1151 n.10 (D.C. Cir. 2014); *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 864

(1982) ("The power to regulate immigration—an attribute of sovereignty essential to the

preservation of any nation—has been entrusted by the Constitution to the political branches of

the Federal Government.").

The role of the Judiciary is to resolve cases and controversies properly brought by parties

with a concrete and particularized injury— not to engage in policymaking better left to the

political branches.  The plaintiff's case raises important questions regarding the impact of illegal

immigration on this Nation, but the questions amount to generalized grievances which are not

proper for the Judiciary to address.  For the reasons explained in more detail below, the plaintiff

lacks standing to bring this challenge to the constitutionality and legality of the immigration

policies at issue.  Accordingly, the plaintiff's motion for a preliminary injunction, ECF No. 7, is

denied and the defendants' motion to dismiss for lack of subject matter jurisdiction, ECF Nos.

13, 15, is granted.[1]

## I.      BACKGROUND

### A.      Executive Enforcement of Immigration Laws

The Immigration and Nationality Act ("INA"), codified as amended at 8 U.S.C. § 1101 *et*

*seq.*, establishes a comprehensive statutory scheme that governs immigration and naturalization.

The INA establishes categories of immigrants who are inadmissible to the United States in the

first instance, *see* 8 U.S.C. § 1182, and immigrants who are subject to removal from the United

States once here, *see* 8 U.S.C. § 1227.  Under the INA, "[a]liens may be removed if they were

---

[1]  The plaintiff filed a motion for preliminary injunction at ECF No. 6 and an amended, corrected motion for
preliminary injunction at ECF No. 7.  Plaintiff's counsel clarified at the motions hearing that the latter filed motion
is the operative motion.  See Rough Transcript of Preliminary Injunction Hearing (Dec. 22, 2014) ("Hrg. Tr.") at 3–
4.  Consequently, the plaintiff's motion for preliminary injunction docketed at ECF No. 6 is denied as moot.

3

inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona*, 132 S.Ct. at 2499 (citing 8 U.S.C. § 1227).

The Secretary of the Department of Homeland Security ("DHS") is "charged with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens."  8 U.S.C. § 1103(a)(1).  Although charged with enforcement of the statutory scheme, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and indeed "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 132 S.Ct. at 2499.  Thus, to enable the "proper ordering of its priorities," *Heckler*, 470 U.S. at 832, and the marshalling of extant resources to address those priorities, the INA provides the Secretary of DHS with the authority to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under [the INA]."  8 U.S.C. § 1103(a)(3).  Further, the Secretary of DHS is specifically charged with "establishing national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), to ensure that DHS's limited resources are expended in pursuit of its highest priorities in national security, border security, and public safety.

The context in which the immigration laws are enforced bears out the need for such prioritization.  DHS estimates that approximately 11.3 million undocumented immigrants residing in the United States are potentially eligible for removal.  Pl.'s Mot., Ex. B (Karl Thompson, Memorandum Opinion for the Sec'y of Homeland Security and the Counsel to the President: *DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* at 1, (Nov. 19, 2014) ("OLC Opinion")) at 1, ECF No. 7-2.  Of those, DHS estimates that the agency has the resources to remove fewer than

4

400,000 undocumented immigrants.  *Id*.  In addition, DHS faces additional challenges including: demographic shifts resulting in increased costs for managing and deterring unauthorized border crossings; increased complexity in removing aliens; congressional directives to prioritize recent border crossers and serious criminals; and the humanitarian and social consequences of separating families.  *See* OLC Opinion at 11; Defs.' Mem. Opp. Pl.'s Mot. Prelim. Inj. ("Defs.' Mem."), Ex. 21 (*Challenges at the Border: Examining the Causes, Consequences, and Responses to the Rise in Apprehensions at the Southern Border:  Hearing Before the S. Comm. on Homeland Security and Governmental Affairs*, 113th Cong. (2014) (statement of Craig Fugate, Administrator, Federal Emergency Management Agency, et al.)), ECF No. 13-21; *see also* Defs.' Mem. at 1.

To confront these challenges, the executive branch has long used an enforcement tool known as "deferred action" to implement enforcement policies and priorities, as authorized by statute.  *See* 6 U.S.C. § 202(5).  Deferred action is simply a decision by an enforcement agency not to seek enforcement of a given statutory or regulatory violation for a limited period of time. In the context of the immigration laws, deferred action represents a decision by DHS not to seek the removal of an alien for a set period of time.  In this sense, eligibility for deferred action represents an acknowledgment that those qualifying individuals are the lowest priority for enforcement.  Under long-existing regulations, undocumented immigrants granted deferred action may apply for authorization to work in the United States.  *See* 8 C.F.R. § 274a.12(c)(14). These regulations were promulgated pursuant to the Immigration Reform and Control Act of 1986 and have been in effect, as amended, since 1987.  *See* Control of Employment of Aliens, 52 Fed. Reg. 16216 (1987).  Deferred action does not confer any immigration or citizenship status or establish any enforceable legal right to remain in the United States and, consequently, may be

canceled at any time.  *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483

(1999) ("At each stage, the Executive has discretion to abandon the endeavor . . . .").

For almost twenty years, the use of deferred action programs has been a staple of

immigration enforcement.  The executive branch has previously implemented deferred action

programs for certain limited categories of aliens, including: certain victims of domestic abuse

committed by United States citizens and Lawful Permanent Residents;[2] victims of human

trafficking and certain other crimes;[3] students affected by Hurricane Katrina;[4] widows and

widowers of U.S. citizens;[5] and certain aliens brought to the United States as children.[6]

Programs similar to deferred action have been used extensively by the executive branch for an

even longer period of time.[7]

---

[2] Defs.' Mem., Ex. 7 (Memorandum for Regional Directors et al.,  from Paul W. Virtue, Acting Executive Associate Commissioner, INS, *Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997)), ECF No. 13-7.

[3] Defs.' Mem., Ex. 8 (Memorandum for Michael A. Pearson, Executive Associate Commissioner, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, *Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* at 2 (Aug. 30, 2001)), ECF No. 13-8.

[4] Defs.' Mem., Ex. 9 (USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)*, at 1 (Nov. 25, 2005)), ECF No. 13-9 ("Since the Notice does not cover Katrina-impacted foreign academic students who have failed to maintain their F-1 status, such persons, and their F-2 dependents, may request a grant of deferred action and short term employment authorization based on economic necessity.").

[5] Defs.' Mem., Ex. 10 (Memorandum for Field Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, *Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 1 (Sept. 4, 2009)), ECF No. 13-10.

[6] This is the DACA program challenged by the plaintiff.  *See* Pl.'s Mot., Ex. A (Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1–2 (June 15, 2012)), ECF No. 6-1.

[7] In the 1970's through the 1990's, programs similar to deferred action were used to defer enforcement against undocumented immigrants who were awaiting approval of certain professional visas, *see United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 979–81 (E.D. Pa. 1977), certain nurses eligible for H-1 visas, *see Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses*, 43 Fed. Reg. 2776, 2776 (Jan 19, 1978); nationals of certain designated foreign states, *see* Defs.' Mem., Ex. 5 (*Moore, Charlotte J.*, Cong. Research Serv., *Review of U.S. Refugee Resettlement Programs and Policies* at 12-14 (1980)), ECF No. 13-5; and spouses and children of aliens who had been granted legal status under the Immigration Reform and Control Act of 1986, *see* Defs.' Mem., Ex. 6 (Memorandum for Regional Commissioners, INS, from Gene McNary, Commissioner, INS, *Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990)), ECF No. 13-6.

Congress has acquiesced to, and even endorsed the use of, deferred action on removal of undocumented immigrants by the executive branch on multiple occasions.  For example, in 2000, Congress expanded the deferred action program for certain victims of domestic abuse, permitting children over the age of twenty-one to be "eligible for deferred action and work authorization." 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV).  Similarly, in 2008, Congress authorized the DHS to "grant . . . an administrative stay of a final order of removal" to individuals who could make an initial showing that they were eligible for a visa as victims of human trafficking and certain other crimes.  *See* 8 U.S.C. § 1227(d)(1).  Congress specifically noted that "[t]he denial of a request for an administrative stay of removal . . . shall not preclude the alien from applying for . . . deferred action."  *See* 8 U.S.C. § 1227(d)(2).  In Division B to the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, known by its short title of the REAL ID Act of 2005, Congress provided that state-issued driver's licenses were acceptable for federal purposes only if the state verifies that an applicant maintains evidence of lawful status, which includes evidence of "approved deferred action status."  *See* Pub. L. No. 109-13, div. B, 119 Stat. 231, 302 (2005) (codified at 49 U.S.C. § 30301 note).

### B.    Challenged Immigration Programs

Against this lengthy historical record of the use of deferred action as a tool to carry out "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), the executive branch has more recently employed this tool in three programs, which the plaintiff challenges as unconstitutional or otherwise in violation of the Administrative Procedure Act.  Specifically, the plaintiff challenges a June 15, 2012 program—known as Deferred Action for Childhood Arrivals ("DACA")—whose guidance is outlined in a memorandum by the former DHS Secretary entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States

as Children."  DACA permits, on a case-by-case basis, deferred action on removal for a period of

two years for undocumented immigrants that: (1) are under the age of 31 as of June 15, 2012; (2)

were under the age of 16 at the time of arrival in the United States; (3) have continuously resided

in the United States for at least five years immediately preceding June 15, 2012; (4) were present

in the United States on June 15, 2012; (5) are in school, have graduated from high school, have

obtained a general education development certificate, or have been honorably discharged from

the Coast Guard or the Armed Forces of the United States; and  (6) have not been convicted of a

felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise

pose no threat to the national security or public safety.   *See* Pl.'s Mot., Ex. A (Memorandum

from Janet Napolitano, Secretary, Department of Homeland Security, to David V. Aguilar,

Acting Commissioner, U.S. Customs and Border Protection, et al., *Exercising Prosecutorial*

*Discretion with Respect to Individuals Who Came to the United States as Children* (June 15,

2012)), at 1–2 , ECF No. 7-1.

The other two programs challenged by the plaintiff are outlined in a memorandum by the

current DHS Secretary entitled "Exercising Prosecutorial Discretion with Respect to Individuals

Who Came to the United States as Children and with Respect to Certain Individuals Who Are the

Parents of U.S. Citizens or Permanent Residents."  The memorandum revised the DACA

program ("2014 DACA Revisions") and also created a new program that established guidelines

for the request of deferred action by the parents of U.S. Citizens or Lawful Permanent Residents

("DAPA").  *See* Pl.'s Mot., Ex. D (Memorandum from Jeh Charles Johnson, Secretary,

Department of Homeland Security, to Leon Rodriguez, Director, U.S. Citizenship and

Immigration Services, et al., *Exercising Prosecutorial Discretion with Respect to Individuals*

*Who Came to the United States as Children and with Respect to Certain Individuals Who Are the*

*Parents of U.S. Citizens or Permanent Residents* (November 20, 2014) ("2014 Guidance

Memorandum")), ECF No. 7-4.

The principal features of the 2014 DACA Revisions include: (1) removal of the age cap

of 31 so that individuals may request deferred action under DACA regardless of their current

age, as long as they entered the United States before the age of 16; (2) extension of the period of

deferred action from two years to three years; and (3) adjustment of the relevant date by which

an individual must have been in the United States from June 15, 2007 to January 1, 2010.  *See*

2014 Guidance Memorandum at 3–4.

DAPA permits, on a case-by-case basis, deferred action on removal for a period of three

years for illegal aliens who are parents of U.S. citizens and Lawful Permanent Residents.  To be

considered for deferred action under DAPA, an individual must meet the following guidelines:

(1) have, as of November 20, 2014, a son or daughter who is a U.S. citizen or Lawful Permanent

Resident; (2) have continuously resided in the United States since before January 1, 2010; (3)

have been physically present in the United States on November 20, 2014 and at the time of

making a request for deferred action with U.S. Citizenship and Immigration Services; (4) have

no lawful status as of November 20, 2014; (5) not fall within one of the categories of

enforcement priorities set forth in additional agency guidelines;[8] and (6) present no other factors

that, in the exercise of discretion, make the grant of deferred action inappropriate.  *Id.*

---

[8] In a November 20, 2014 Memorandum entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants," the Secretary of DHS set forth three categories of undocumented immigrants who are considered to be priorities for removal.  The first category, representing the highest priority for civil immigration authorities, concerns undocumented immigrants who are threats to national security, border security, and public safety.  The second category, representing the second-highest priority for civil immigration authorities, concerns undocumented immigrants who have committed certain misdemeanors or recently committed certain immigration violations.  The third category, representing the third-highest priority for civil immigration authorities, concerns undocumented immigrants who have been issued a final order of removal on or after January 1, 2014.  *See* Pl.'s Mot., Ex. F (Memorandum from Jeh Charles Johnson, Secretary, Department of Homeland Security, to Thomas S. Winkowski, Acting Director, U.S. Immigration and Customs Enforcement, et al., *Policies for the Apprehension,*

9

### C.    Procedural Background

On November 20, 2014, in a televised address, President Barack Obama announced the principal features of the most recent deferred action programs, namely, the 2014 DACA Revisions and DAPA. On the same day, the plaintiff filed this action seeking invalidation of these two programs as well as DACA, which had been announced over two years earlier. Although the plaintiff's Complaint references a preliminary injunction, the plaintiff did not formally or separately move for a preliminary injunction, as required by the Local Civil Rules of this Court, until December 4, 2014.  *See* Pl.'s Mot.; Local Civ. R. 65.1; Minute Order (Nov. 24, 2014).

In accordance with the Local Rules governing preliminary injunctions—which permit a defendant seven days to respond to a motion for preliminary injunction once served—the Court ordered the defendants to respond to the plaintiff's motion for preliminary injunction by December 15, 2014.  Ordinarily, the Local Rules make no provision for a reply brief in a motion for preliminary injunction and the Court did not initially permit a reply brief in this case.  *See* Local Civ. R. 65.1.  In opposition to the motion for preliminary injunction, the defendants argued that the plaintiff lacked standing to bring this suit and requested dismissal of the suit.  *See* Defs.' Mem. at 14.  The defendants subsequently asked this Court to construe this opposition as a motion to dismiss for lack of subject matter jurisdiction.  *See* Notice, ECF No. 15.  Due to the dispositive nature of the defendants' objection, and to ensure fairness to all the parties, the Court afforded the plaintiff the opportunity to submit a response to the defendants' objections.  In addition, the Court permitted the plaintiff to file a supplemental declaration in support of his standing to bring suit.  The Court heard argument from both parties on December 22, 2014.

---

*Detention and Removal of Undocumented Immigrants* (November 20, 2014) at 3–4 , ECF No. 7-6.  The plaintiff does not challenge the guidelines set forth in this memorandum.  *See* Hrg. Tr. at 11.

Now pending before the Court is the plaintiff's motion for a preliminary injunction and the defendants' motion to dismiss for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1).

## II.   LEGAL STANDARD

### A.   Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011))).  A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)) (emphasis in original). The Supreme Court repeated this caution in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), stating that "[a] preliminary injunction is an extraordinary remedy never awarded as of right," *id.* at 24, and, again, that "injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *id.* at 22.

Authority can be found in this Circuit for the so-called "sliding scale" approach to evaluating the four preliminary injunction factors, such that "a strong showing on one factor could make up for a weaker showing on another."  *Sherley*, 644 F.3d at 392.  In particular, even if the plaintiff only "raise[s] a serious legal question on the merits," rather than a likelihood of success on the merits, a strong showing on all three of the other factors may warrant entry of

11

injunctive relief.  *Id.* at 398; *see also Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1292

(D.C. Cir. 2009) ("[I]f the movant makes a very strong showing of irreparable harm and there is

no substantial harm to the non-movant, then a correspondingly lower standard can be applied for

likelihood of success."); *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d

841, 843 (D.C. Cir. 1977) ("[A] court, when confronted with a case in which the other three

factors strongly favor interim relief may exercise its discretion to grant a stay if the movant has

made a substantial case on the merits.").

At the same time, the D.C. Circuit has acknowledged that the Supreme Court's decision

in *Winter* "could be read to create a more demanding burden than the sliding-scale analysis

requires."  *Sherley*, 644 F.3d at 392 (internal quotations omitted).[9]  Indeed, in *Winter*, the

majority of the Supreme Court reversed a grant of injunctive relief, finding that the standard

applied by the Ninth Circuit was "too lenient" in allowing injunctive relief on the "possibility" of

irreparable injury, rather than its likelihood.  *Winter*, 555 U.S. at 22; *see also Perry v. Perez*, 132

S. Ct. 934, 942 (2012) ("Plaintiffs seeking a preliminary injunction of a statute must normally

demonstrate that they are likely to succeed on the merits of their challenge to that law.").

In *Aamer v. Obama*, the D.C. Circuit declined to opine about the continued viability of

the "sliding scale" analysis of the four preliminary injunction factors, stating that it "remains an

open question whether the 'likelihood of success' factor is 'an independent, free-standing

requirement,' or whether, in cases where the other three factors strongly favor issuing an

injunction, a plaintiff need only raise a 'serious legal question' on the merits."  742 F.3d at 1043;

*see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 746 F.3d 1065, 1074 (D.C. Cir. 2014) ("This

circuit has repeatedly declined to take sides in a circuit split on the question of whether

_____

[9] The plaintiff, in his briefing, notes only the sliding-scale analysis and ignores the voluminous case law describing
the uncertainty regarding the continued viability of the sliding-scale analysis in this Circuit.  *See* Pl.'s Mot. at 11.

likelihood of success on the merits is a freestanding threshold requirement to issuance of a preliminary injunction. . . . We need not take sides today.").

Under either approach, a court may not issue "a preliminary injunction based only on a possibility of irreparable harm . . . [since] injunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22; s*ee also In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring proof that all four prongs of preliminary injunction standard be met before injunctive relief can be issued). Thus, the plaintiff bears the burden of persuasion on all four preliminary injunction factors in order to secure such an "extraordinary remedy."

### B.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Indeed, federal courts are "forbidden . . . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, have "an affirmative obligation 'to consider whether the constitutional and statutory authority exist for us to hear each dispute.'" *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quoting *Herbert v. National Academy of Sciences*, 974 F.2d 192, 196 (D.C. Cir. 1992)). Absent subject matter jurisdiction over a case, the court must dismiss it. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); FED. R. CIV. P. 12(h)(3).

When considering a motion to dismiss under Rule 12(b)(1), the court must accept as true all uncontroverted material factual allegations contained in the complaint and "'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the

13

facts alleged' and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (quoting *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004))).  The court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  Moreover, in evaluating subject matter jurisdiction, the court, when necessary, may "'undertake an independent investigation to assure itself of its own subject matter jurisdiction,'" *Settles v. United States Parole Comm'n*, 429 F.3d 1098, 1107-1108 (D.C. Cir. 2005) (quoting *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987), and consider facts developed in the record beyond the complaint, *id.  See also Herbert v. National Academy of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992) (in disposing of motion to dismiss for lack of subject matter jurisdiction, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."); *Alliance for Democracy v. FEC*, 362 F. Supp. 2d 138, 142 (D.D.C. 2005).

The burden of establishing any jurisdictional facts to support the exercise of the subject matter jurisdiction rests on the plaintiff.  *See Hertz Corp. v. Friend*, 559 U.S. 77, 96-97 (2010); *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942); *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007).

III.   **DISCUSSION**

The plaintiff concedes, as he must, that "he and other similarly situated state law enforcement and other officials have no authority" to enforce the immigration laws of the United States.  Compl. at 19; *see also Arizona*, 132 S. Ct. at 2507.  Nonetheless, the plaintiff seeks to

alter federal enforcement policy by asking the Court to halt three federal immigration programs that have the over-arching purpose of prioritizing federal enforcement efforts. *See Arizona,* 132 S. Ct. at 2499 (noting that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," who "as an initial matter, must decide whether it makes sense to pursue removal at all.").  The plaintiff's inability to enforce federal immigration law is integrally related to the central question in this case:  Whether the plaintiff has standing to demand changes to the "broad discretion" granted federal officials regarding removal.  Despite the consequences of unlawful immigration in Maricopa County, the plaintiff cannot meet the requirements for standing to bring this suit.

### A.     The Plaintiff Lacks Standing

Article III of the Constitution restricts the power of federal courts to hear only "Cases" and "Controversies."  "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (alterations in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Indeed, "'[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation on federal-court jurisdiction to actual cases or controversies.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (alterations in original) (internal quotations omitted).

The Supreme Court has explained, "the irreducible constitutional minimum of standing contains three elements."  *Defenders of Wildlife*, 504 U.S. at 560.  First, the plaintiff must have suffered an "injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Id.* (citations

and internal quotation marks omitted).  Second, there must be "a causal connection between the injury and the conduct complained of," i.e., the injury alleged must be fairly traceable to the challenged action of the defendant.  *Id.*  Finally, it must be "likely" that the complained-of injury will be "redressed by a favorable decision" of the court.  *Id.* at 561.  In short, "[t]he plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014).  Likewise, when declaratory or injunctive relief is sought—relief the plaintiff seeks here—a plaintiff "must show he is suffering an ongoing injury or faces an immediate threat of [future] injury." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

The plaintiff fails to meet any of the three elements of constitutional standing.  Each of these requirements is addressed *seriatim* below.

### 1.      *Injury in Fact*

At the outset, the plaintiff's Complaint and motion for preliminary injunction fail to identify whether the plaintiff is bringing suit in his individual capacity or in his official capacity as the elected Sheriff of Maricopa County.  *Compare* Compl. ¶ 3 (noting only that "[t]he Plaintiff Joe Arpaio is the elected Sheriff of Maricopa County, State of Arizona"), *with* ¶ 8 (detailing that each defendant was being sued "in their individual and official capacities").  The Court clarified during oral argument that the plaintiff is bringing suit in both his personal and official capacities. Hrg. Tr. at 5.  Regardless of whether the plaintiff is suing in his individual or official capacity, or both, the plaintiff cannot demonstrate a cognizable injury from the challenged deferred action programs.

16

a)     *Personal Capacity*

The law is well-settled that ordinarily, "private persons . . . have no judicially cognizable

interest in procuring enforcement of the immigration laws . . . ."  *Sure-Tan, Inc. v. N.L.R.B.*, 467

U.S. 883, 897 (1984) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).  This is merely

the application of the long-standing principle that a plaintiff "raising only a generally available

grievance about government—claiming only harm to his and every citizen's interest in proper

application of the Constitution and laws, and seeking relief that no more directly and tangibly

benefits him than it does the public at large—does not state an Article III case or controversy."

*Hollingsworth v. Perry*, 133 S. Ct. 2652, 2662 (2013) (quoting *Defenders of Wildlife*, 504 U.S. at

573–74).  As a result, a plaintiff who seeks to vindicate only the general interest in the proper

application of the Constitution and laws does not suffer the type of direct, concrete and tangible

harm that confers standing and warrants the exercise of jurisdiction.  Yet, this is the type of suit

the plaintiff attempts to bring in his personal capacity.  *See* Supp. Decl. of Sheriff Joe Arpaio ¶ 3

("Pl.'s Supp. Decl."), ECF No. 20-1 ("By this lawsuit, I am seeking to have the President and the

other Defendants obey the U.S. Constitution and the immigration laws . . . .").

The plaintiff does offer one additional theory, however, in support of his claim of

injury in his individual capacity.  The plaintiff cites press reports and press releases from his own

office that undocumented immigrants have targeted him for assassination as a result of the

plaintiff's "widely known stance on illegal immigration."  *See* Press Release, Bomb Threats

against Sheriff Arpaio and Office on Upsurge as Another Suspect is Indicted, Maricopa County

Sheriff's Office (August 21, 2013) ("Threats Press Release"), ECF No. 21-1.  Such threats are

deplorable and offensive to the entire justice system.  Nevertheless, these allegations cannot

confer standing on the plaintiff in his individual capacity in this case.  In requesting injunctive

17

relief, the plaintiff "must show he is suffering an ongoing injury or faces an immediate threat of

[future] injury." *Dearth*, 641 F.3d at 501.  The plaintiff has presented no evidence that these

threats are ongoing.  "'Past exposure to illegal conduct does not in itself show a present case or

controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse

effects.'" *Defenders of Wildlife*, 504 U.S. at 564 (quoting  *Los Angeles v. Lyons*, 461 U.S. 95,

102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974))).

Moreover, as will be discussed in detail below, even an ongoing threat to the plaintiff by

undocumented immigrants would not provide the plaintiff with standing to challenge the

deferred action programs at issue.  The plaintiff must not only show that he is injured, but that

the plaintiff's injury is fairly traceable to the challenged deferred action programs and that the

injury is capable of redress by this Court in this action.  The plaintiff cannot meet this showing.

The challenge deferred action programs did not cause the threats to the plaintiff's life.  Rather,

criminal action by third-parties not before the court caused the threats to the plaintiff.  Moreover,

according to the plaintiff's press release, the alleged assassins were motivated by the plaintiff's

"widely known stance on illegal immigration," a stance pre-existing this case and these

challenged programs.  *See* Threats Press Release.  Furthermore, an injunction in this case would

do nothing either to alter the plaintiff's views on "illegal immigration" or to redress the targeting

of the plaintiff resulting from his "widely known stance on illegal immigration."  This dooms the

plaintiff's standing to bring this suit in his personal capacity as an ordinary citizen.

b)    *Official Capacity*

Even if the plaintiff can circumvent these limitations by bringing suit in his official

capacity as Sheriff of Maricopa County, the plaintiff still lacks standing.

18

The plaintiff claims that the challenged deferred action programs, which provide guidance to Federal law enforcement regarding the removal or non-removal of undocumented immigrants, inhibit his ability to perform his official functions as the Sheriff of Maricopa County.  The plaintiff alleges that he is "adversely affected and harmed in his office's finances, workload, and interference with the conduct of his duties" as a result of the "increases in the influx of illegal aliens motivated by [these] policies of offering amnesty."  Compl. ¶ 27.  As support for this allegation, he alleges that "experience has proven as an empirical fact that millions more illegal aliens will be attracted into the border states of the United States, regardless of the specific details" of the challenged policies.  Compl. ¶ 30.  The plaintiff further alleges that, "the experiences and records of the Sheriff's office show that many illegal aliens . . . are repeat offenders, such that Plaintiff Arpaio's deputies and other law enforcement officials have arrested the same illegal aliens for various different crimes."  Compl. ¶ 31.  According to the plaintiff, the "financial impact of illegal aliens in Maricopa County, Arizona was at least $9,293,619.96 in the costs of holding illegal aliens in the Sheriff's jails from February 1, 2014, through December 17, 2014, for those inmates flagged with INS 'detainers.'"  Pl.'s Reply Defs.' Opp. Pl.'s Mot. Prelim. Inj. at 7 ("Pl.'s Reply"), ECF No. 19.

The plaintiff is correct that the regulation and impairment of a state officer's official functions may be sufficient to confer standing, but only in certain limited circumstances.  *See, e.g.*, *Lomont v. O'Neil*, 285 F.3d 9, 13–14 (D.C. Cir. 2002) (holding that a state Sheriff and Police Chief had standing to challenge federal law permitting state police officials to provide certifications relating to the transfer of certain firearms); *Fraternal Order of the Police v. United States*, 152 F.3d 998, 1001–02 (D.C. Cir. 1998).  Yet, neither *Lomont* nor *Fraternal Order of the Police* support the plaintiff's argument here, as both cases concerned the *direct regulation* of a

19

state officer's official duties.  In contrast, the challenged deferred action programs do not

regulate the official conduct of the plaintiff but merely regulate the conduct of federal

immigration officials in the exercise of their official duties.  Thus, even if the plaintiff's official

functions could be viewed as a "legally protected interest," the challenged deferred action

programs do not amount to "an invasion" of that interest in a manner that is "concrete and

particularized."  *Defenders of Wildlife*, 504 U.S. at 560.  Indeed, it is not apparent exactly what

cognizable interest and injury the plaintiff can assert since, as the plaintiff's Complaint

recognizes, the plaintiff has no legal authority to enforce the immigration laws of the United

States.  *See* Compl. at 19.

Ultimately, the plaintiff's standing argument reduces to a simple generalized grievance:

A Federal policy causes his office to expend resources in a manner that he deems suboptimal.[10]

To accept such a broad interpretation of the injury requirement would permit nearly all state

officials to challenge a host of Federal laws simply because they disagree with how many—or

how few—Federal resources are brought to bear on local interests.  Fortunately, the standing

doctrine is not so limp.  As the Supreme Court has repeatedly emphasized: "'a plaintiff raising

only a generally available grievance about government—claiming only harm to his and every

citizen's interest in [the] proper application of the Constitution and laws, and seeking relief that

no more directly [or] tangibly benefits him than it does the public at large—does not state an

---

[10] Although prior case law has occasionally suggested that "generalized grievances" should be analyzed as part of prudential standing, the Supreme Court recently suggested that such concerns should be considered as part of Article III standing.  *See Lexmark Int'l*, 134 S. Ct. at 1387 n.3 ("While we have at times grounded our reluctance to entertain [suits concerning generalized grievances] in the 'counsels of prudence' (albeit counsels 'close[ly] relat[ed] to the policies reflected in' Article III), we have since held that such suits do not present constitutional 'cases' or 'controversies.'" (internal citations omitted) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475 (1982))).  Although there is some dispute within this Circuit as to whether prudential standing should be considered jurisdictional, there is no dispute that where the plaintiff cannot meet the irreducible constitutional minimum of Article III standing, the court need not address whether the plaintiff has prudential standing.  *See generally Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169 (D.C. Cir. 2012).  Accordingly, the Court does not address whether prudential concerns prevent the plaintiff from establishing standing.

Article III case or controversy.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (quoting *Lujan*, 504 U.S. at 573); *see also* Pl.'s Supp. Decl. ¶ 3 ("By this lawsuit, I am seeking to have the President and other Defendants obey the U.S. Constitution and the immigration laws . . . ."). Simply put, a state official has not suffered an injury in fact to a legally cognizable interest because a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources. *Cf. Massachusetts v. EPA*, 549 U.S. 497, 520-521 (2007) (finding standing for Massachusetts because of state's "quasi-sovereign interests" relating to its "desire to preserve its sovereign territory" not because of the increase in state expenditures resulting from federal policy concerning global warming).

Moreover, the plaintiff's alleged injury is largely speculative.  The plaintiff argues that the challenged deferred action programs will create a "magnet" by attracting new undocumented immigrants into Maricopa County, some of whom may commit crimes under Arizona law.  Pl.'s Mot. at 16–17; *see also* Pl.'s Mot., Ex. G, Decl. of Sheriff Joe Arpaio ¶¶ 7, 11–14, ECF No. 7-7. Yet, the decision for any individual to migrate is a complex decision with multiple factors, including factors entirely outside the United States' control, such as social, economic and political strife in a foreign country.  The plaintiff reduces this complex process to a single factor: the challenged deferred action programs.

Even drawing all inferences in favor of the plaintiff, the terms of the challenged deferred action programs do not support the plaintiff's theory.  The challenged deferred action programs would have no impact on *new* immigrants, as the guidance defining the programs makes clear that these programs only apply to undocumented immigrants residing in the United States prior to January 1, 2010.  2014 Guidance Memorandum at 4.  Thus, it is speculative that a program,

21

which does not apply to future immigrants, will nonetheless result in immigrants crossing the border illegally into Maricopa County (and other borders of this country).

The plaintiff has been unable to show that the challenged deferred action programs have interfered with his official duties as Sheriff in a manner that "is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical" and has therefore failed in his burden to establish an injury in fact. *Defenders of Wildlife*, 504 U.S. at 560.

### 2.    *Causation and Redressability*

The plaintiff's speculative injury is not the only infirmity in the plaintiff's standing theory. A plaintiff must not only show an "injury in fact," but must also show that the injury is fairly traceable to the allegedly harmful conduct and that the relief sought by the plaintiff will likely redress the injury. *Defenders of Wildlife*, 504 U.S. at 560. Two overarching principles apply to the causation and redressability inquiry in this case.

First, this case involves the purported "standing to challenge [an executive action] where the direct cause of injury is the independent action of . . . third part[ies]." *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1269 (D.C. Cir. 2007). Indeed, it is the actions taken by undocumented immigrants—migrating to Maricopa County and committing crimes once there—that are purportedly the direct cause of the plaintiff's injury. As will be discussed, however, "courts [only] occasionally find the elements of standing to be satisfied in cases challenging government action on the basis of third-party conduct." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940 (D.C. Cir. 2004).[11]

---

[11]  The plaintiff attempts to rely upon the doctrine of competitor standing to avoid the strict limitations imposed on cases where the source of the plaintiff's harm is the independent actions of third parties. Yet, the cases on which the plaintiff relies, *see Mendoza v. Perez*, 754 F.3d 1002, 1012–14 (D.C. Cir. 2014); *Honeywell Int'l Inc. v. EPA*, 374 F.3d 1363, 1369 (D.C. Cir. 2004); and *Washington Alliance of Tech. Workers v. U.S. Dep't of Homeland Sec.*, No. 14-cv-529, 2014 WL 6537464, at *4 (D.D.C. Nov. 21, 2014), do not support the plaintiff's standing argument in this case. Standing was found in those cases because a plaintiff suffered an injury in fact "when an agency lift[ed] regulatory restrictions on their competitors or otherwise allow[ed] increased competition." *Mendoza*, 754 F.3d at

22

Second, and relatedly, the programs challenged by the plaintiff do not regulate the plaintiff directly; rather, they regulate federal immigration officials.  As the Supreme Court has made clear, "[w]hen . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed" to confer standing.  *Defenders of Wildlife*, 504 U.S. at 562 (emphasis in original).  When standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict . . .  it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* (internal quotations and citations omitted); *see also id.* ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." (internal quotation marks omitted)).

The Court first addresses the plaintiff's failure to show causation before discussing the plaintiff's failure to demonstrate redressability.

a)      *Causation*

The D.C. Circuit has identified "two categories of cases where standing exists to challenge government action though the direct cause of injury is the action of a third party." *Renal Physicians*, 489 F.3d at 1275.  "First, a federal court may find that a party has standing to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action."  *National Wrestling Coaches*, 366 F.3d at

---

1011 (quoting *La. Energy and Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)).  The doctrine of competitor standing is not implicated in this case, as the plaintiff's resources are not strained because he is forced to compete with undocumented immigrants in a limited market.  Moreover, the plaintiff cannot rely on a supposed "procedural injury" because, since the plaintiff has no authority to enforce the Federal immigration laws, the plaintiff cannot demonstrate the challenged deferred action programs "threaten[] [a] concrete interest" of the plaintiff as opposed to an injury common to all members of the public.  *Mendoza*, 754 F.3d at 1010.

23

940.  Importantly, in this category of cases, the challenged government conduct must authorize the specific third-party conduct that causes the injury to the plaintiff.  *See Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998) ("Supreme Court precedent establishes that the causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries . . . .").  In the present case, the challenged agency action—the ability to exercise enforcement discretion to permit deferred action relating to certain undocumented immigrants—does not authorize the conduct about which the plaintiff complains.  The challenged deferred action programs authorize immigration officials to exercise discretion on removal; they do not authorize new immigration into the United States (let alone Maricopa County); they do not authorize undocumented immigrants to commit crimes; and they do not provide permanent status to any undocumented immigrants eligible to apply for deferred action under any of the challenged programs.  Contrary to the plaintiff's assertion that a consequence of the challenged programs will be an increase in illegal conduct by undocumented immigrants and an increase in costs to the Maricopa County Sheriff's office, these programs may have the opposite effect.  The deferred action programs are designed to incorporate DHS's enforcement priorities and better focus federal enforcement on removing undocumented immigrants committing felonies and serious misdemeanor crimes.  Since the undocumented immigrants engaging in criminal activity are the cause of the injuries complained about by the plaintiff, the more focused federal effort to remove these individuals may end up helping, rather than exacerbating the harm to, the plaintiff.

Second, standing has been found "where the record present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little

doubt as to causation and the likelihood of redress." *National Wrestling Coaches*, 366 F.3d at 941.  This record is sparse regarding a link between the challenged deferred action programs and the third-party conduct.  Although the plaintiff has submitted numerous press releases and letters to officials documenting Maricopa County's struggle with illegal immigration along the southern border, the plaintiff has submitted no evidence showing that the challenged deferred action programs are, or will be, the cause of the crime harming the plaintiff or the increase in immigration, much less "substantial evidence."  Indeed, the plaintiff severely undermines his own argument by stating that "millions more illegal aliens will be attracted into the border states of the United States, *regardless of the specific details*" of current executive branch immigration policies.  Compl. ¶ 30 (emphasis added).  If the details of the challenged deferred action programs do not matter as to whether or not the plaintiff will suffer an injury, then the plaintiff's injuries cannot be fairly traceable to these programs.  Similarly, the plaintiff observes that "the Executive Branch is not deporting illegal aliens in any significant numbers" and that regardless of the provision of deferred action programs "illegal aliens are very unlikely to be deported." Pl.'s Mot. at 12.  Implicit in this observation is the plaintiff's admission that regardless of the challenged deferred action programs, the plaintiff is likely to continue to suffer the claimed injury.

In sum, the plaintiff has failed to demonstrate that the challenged deferred action programs are the cause of his alleged injury.

> b)     *Redressability*

Similar to the causation requirement, "it is 'substantially more difficult' for a petitioner to establish redressability where the alleged injury arises from the government's regulation of a third party not before the court." *Spectrum Five LLC v. Fed. Commc'ns Comm'n*, 758 F.3d 254,

261 (D.C. Cir. 2014) (quoting *Nat'l Wrestling Coaches*, 366 F.3d at 933); *see also Defenders of Wildlife*, 504 U.S. at 562.  The plaintiff must allege facts that are "sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Renal Physicians*, 489 F.3d at 1275.  In other words, the plaintiff must allege facts sufficient to demonstrate a substantial likelihood that, as a result of injunctive relief in this case, there would not be an increase in undocumented immigrants in Maricopa County and there would not be an increase in crimes committed by undocumented immigrants in Maricopa County.  This is a "substantially more difficult" task.  *Spectrum Five LLC*, 758 F.3d at 261.

On this point, the D.C. Circuit's decision in *National Wrestling Coaches* is instructive. There, plaintiffs challenged an interpretive rule promulgated by the Department of Education, which laid out three ways in which the Department would assess whether educational institutions had complied with Department regulations that required such institutions to select sports and levels of competition to "effectively accommodate the interests and abilities of members of both sexes.'"  366 F.3d at 934–35 (quoting 45 C.F.R. § 86.41(c)(1) and 34 C.F.R. § 106.41(c)(1)). That regulation had been promulgated pursuant to Title IX of the Education Amendments of 1972, which prohibited discrimination on the basis of sex in federally funded educational programs and activities.  *See id.* at 934.  The plaintiffs were "membership organizations representing the interests of collegiate men's wrestling coaches, athletes, and alumni," and their asserted injuries arose "from decisions by educational institutions to eliminate or reduce the size of men's wrestling programs to comply with the Department's interpretive rules implementing Title IX."  *Id.* at 935.

Thus, in *National Wrestling Coaches*, like in the instant case, "the necessary elements of causation and redressability . . . hinge[d] on the independent choices of . . . regulated third part[ies]." *Id.* at 938. The D.C. Circuit found redressability lacking in *National Wrestling Coaches* because "nothing but speculation suggests that schools would act any differently than they do with the [challenged interpretive rule] in place" since "[s]chools would remain free to eliminate or cap men's wrestling teams and may in some circumstances feel compelled to do so to comply with the statute and the [previous Department] Regulations." *Id.* at 940. Further, the court found that "other reasons unrelated to the challenged legal requirements [*e.g.*, moral considerations, budget constraints] may continue to motivate schools to take such actions." *Id.* From this analysis, and a comprehensive review of the case law, the *National Wrestling Coaches* court concluded that "it is purely speculative whether a decision in appellants' favor would alter the process by which schools determine whether to field certain sports teams." *Id.* at 944.

The same concerns animating the outcome in *National Wrestling Coaches* drive the result in this case. Many "other reasons unrelated to the challenged legal requirements" may motivate the conduct allegedly causing harm to the plaintiff. Indeed, the motivation for any individual to come to the United States (or, once present here, to commit a crime in Maricopa County), does not rest solely upon the challenged deferred action programs. Such decisions are complicated and multi-faceted, involving both national and international factors. A ruling by this Court enjoining the challenged deferred action programs will likely not change the complex and individualized decision making of undocumented immigrants allegedly causing harm to the plaintiff. As noted, the plaintiff's briefing admits as much: "millions more illegal aliens will be attracted into the border states of the United States, *regardless of the specific details*" of the challenged deferred action programs. Compl. ¶ 30.

27

Moreover, the plaintiff acknowledges that the defendants only have limited resources to facilitate removal, *see* Hrg. Tr. at 14.  Relief from this Court will not grant additional resources to the executive branch allowing it to remove additional undocumented immigrants or to prevent undocumented immigrants from arriving.  Thus, the plaintiff's complaint regarding the large number of undocumented immigrants and the limited number of removals will not change as a result of any order by the Court in this litigation.  Consequently, the plaintiff's alleged harm stemming from the expenditure of resources to deal with the large number of undocumented immigrants in Maricopa County will remain.  In other words, regardless of the outcome of this case, the Court can afford no relief to the plaintiff's injury.  *Cf. Bauer v. Marmara*, No. 13-ap-7081, 2014 WL 7234818, at *6 (D.C. Cir. December 19, 2014) (holding that plaintiff was "unable to satisfy the redressability prong of Article III standing because the court cannot compel the Government to pursue action to seek forfeiture of the disputed vessels").

"When redress depends on the cooperation of a third party, 'it becomes the burden of the [party asserting standing] *to adduce facts* showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.'"  *U.S. Ecology v. U.S. Dep't of Interior*, 231 F.3d 20, 24–25 (D.C. Cir. 2000) (emphasis added) (quoting *Defenders of Wildlife*, 504 U.S. at 562); *see also Klamath Water v. Fed. Energy Reg. Comm'n*, 534 F.3d 735, 739 (D.C. Cir. 2008) ("In a case like this, in which relief for the petitioner depends on actions by a third party not before the court, the petitioner must demonstrate that a favorable decision would create 'a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002))).  The plaintiff has been unable to meet this burden.

*        *        *

28

Taken together, the Court finds that the plaintiff has not and cannot show that: (1) he suffers a concrete and particularized injury (as opposed to a speculative and generalized grievance); (2) the cause of the plaintiff's injury can be fairly traced to the challenged deferred action programs; and (3) a favorable ruling by this Court would redress the plaintiff's alleged injury.  A plaintiff "may be disappointed if the Government declines to pursue [enforcement], but disappointment of this sort is a far cry from the injury and redressability required to prove Article III Standing." *Bauer*, 2014 WL 7234818, at *6.  As a result, the plaintiff lacks standing to bring this challenge, requiring dismissal of this lawsuit for lack of subject matter jurisdiction.

## B.    Preliminary Injunction

The plaintiff's motion for preliminary injunction likewise fails as the plaintiff can show neither a likelihood of success on the merits nor irreparable harm due to his lack of standing.  As an initial matter, because "standing is a necessary predicate to any exercise of [the Court's] jurisdiction, the [plaintiff] and [his] claims have no likelihood of success on the merits," if the plaintiff lacks standing.  *Smith v. Henderson*, 944 F. Supp. 2d 89, 99 (D.D.C. 2013) (internal quotations and citations omitted); *see also Kingman Park Civic Ass'n v. Gray*, 956 F. Supp. 2d 230, 241 (D.D.C. 2013) ("The first component of the likelihood of success on the merits prong usually examines whether the plaintiffs have standing in a given case." (internal quotations omitted)).

Moreover, the same problem that confronts the plaintiff's standing argument—the inability to obtain redress from an order by this Court—likewise dooms the plaintiff's ability to show irreparable harm.  Indeed, "it would make little sense for a court to conclude that a plaintiff has shown irreparable harm when the relief sought would not actually remedy that harm." *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011); *see also Navistar, Inc. v.*

*Environmental Protection Agency*, No. 11-cv-449, 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011) (Wilkins, J.) ("Because an injunction will not redress its alleged injuries, [the plaintiff's] claim that it will suffer irreparable harm in the absence of a preliminary injunction is tenuous at best.").

Nevertheless, even if the plaintiff were able to establish standing, the plaintiff would face a number of legal obstacles to prevail and, therefore, could not demonstrate a likelihood of success on the merits nor any of the other preliminary injunction factors.[12]  While not necessary

---

[12] The plaintiff has highlighted a recently out-of-Circuit opinion from the Western District of Pennsylvania ("Pennsylvania court") to buttress his claims regarding his likelihood of success on the merits. *See* Pl.'s Notice of Suppl. Auth., ECF No. 14 (citing *United States v. Juarez-Escobar*, 2014 U.S. Dist. LEXIS 173350 (W.D. Pa. Dec. 16, 2014)). In that case, the court considered the applicability of the DAPA program to a criminal defendant (who had been arrested locally for driving under the influence with a minor present in the vehicle) in connection with the defendant's sentencing, upon his plea of guilty to illegal reentry in violation of 8 U.S.C. § 1326. *Id*. at *1–*4. Throughout the opinion, the court expresses an over-arching concern with the fairness of the prosecution in light of the uneven enforcement of the immigration laws. *See, e.g.*, *id*. at *5 ("Defendant appears before this Court, in part, because of arguably unequal and arbitrary immigration enforcement in the United States."); *id*. at *6–*7 (observing that "[h]ad Defendant been arrested in a 'sanctuary state' or a 'sanctuary city,' local law enforcement likely would not have reported him to Homeland Security" and "he would likely not have been indicted" and "would not be facing sentencing and/or deportation"); *id*. at *39–*40 (noting "an arbitrariness to Defendant's arrest and criminal prosecution" given existence of "'sanctuary cities' [where] . . . if an undocumented immigrant was arrested for a minor offense, local law enforcement would not automatically notify ICE"); *id*. at *41 (describing "Defendant's current criminal prosecution and the civil deportation hearing that will undoubtedly follow as a result of this criminal proceeding" as "arguably . . . arbitrary and random"). Consistent with this theme, the court reviewed the DAPA program to evaluate "whether it would unjustly and unequally impact this Defendant in light of this Court's obligation to avoid sentencing disparities among defendants with similar records who have been found guilty of similar conduct," citing 18 U.S.C. § 3553(a)(6). *Id*. at *24; *see also id*. at *12–*13 (expressing "concern[] that the Executive Action might have an impact on this matter, including any subsequent removal or deportation"). In other words, under the rubric of a sentencing factor that sentencing courts are required to consider under 18 U.S.C. § 3553(a), the Pennsylvania court set out to evaluate whether the DAPA program was applicable to the defendant and, if so, whether the consequences of his conviction, including deportation, would amount to an unwarranted sentencing disparity because similarly situated defendants could obtain deferred removal. *See* 18 U.S.C. § 3553(a)(6)(requiring sentencing court, "in determining the particular sentence to be imposed," to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

The Pennsylvania court ultimately determined that the DAPA program was not applicable to the defendant for two reasons: first, the court opined that the DAPA program "is unconstitutional," *id*. at *33, *58;  and, second, even if the DAPA program were constitutional, the court made critical factual findings that the defendant did not meet the eligibility criteria for DAPA's deferred action, *id*. at *45 ("The bottom line for this Defendant is that . . . he does not fall into any newly created or expanded deferment category . . . ."); *id*. at *57 ("this Defendant is possibly not entitled to the deferred action status that would enable him to defer deportation").  Despite the defendant's lack (or "possible[]" lack) of eligibility for the DAPA program, the court viewed the defendant as "more 'family' than 'felon,'" *id*. at *45, *58, due to his "close bond with his brother," who resided in the United States, *id*. at *57–*58, prompting the court to give the defendant the opportunity to withdraw his guilty plea or proceed to sentencing, *id*. at *59.

to resolve this case, the Court outlines several of these obstacles.  First, with respect to the

plaintiff's likelihood of success on the merits, the challenged deferred action programs continue

a longstanding practice of enforcement discretion regarding the Nation's immigration laws.

Such discretion is conferred by statute, *see* 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3), and the

manner of its exercise through deferred action on removal has been endorsed by Congress, *see,*

*e.g.,* 8 U.S.C. § 1227(d)(2).  Thus, the deferred action programs are consistent with, rather than

contrary to, congressional policy.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

635 (1952) (Jackson, J. concurring).

In addition, although the challenged deferred action programs represent a large class-

based program, such breadth does not push the programs over the line from the faithful execution

of the law to the unconstitutional rewriting of the law for the following reason:  The programs

---

While fully respectful of the concern animating this decision, which focused on the fairness of the prosecution and guilty plea of the defendant for the crime of illegal reentry, this Court does not find the reasoning persuasive for at least three reasons. First, most notably, the Pennsylvania court's consideration of the constitutionality of the DAPA program flies in the face of the "'well-established principle governing the prudent exercise of [a] [c]ourt's jurisdiction that normally [a] [c]ourt will not decide a constitutional question if there is some other ground upon which to dispose of the case.'"  *Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 206 (2009) (quoting *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam); *see also United States v. Thomas*, 572 F.3d 945, 952 (D.C. Cir. 2009) (Ginsburg J., concurring).  Thus, the Pennsylvania court appears to have put the proverbial "cart before the horse" since finding the defendant likely ineligible for the DAPA program made consideration of the program's constitutionality unnecessary.  Second, the purported basis for the Pennsylvania court's consideration of the DAPA program was to avoid unwarranted sentencing disparities, as required by 18 U.S.C. § 3553(a)(6).  Yet, the DAPA program has no bearing on the *sentence* imposed by the Pennsylvania court since, as the Supreme Court has made clear, "[r]emoval is a civil, not criminal, matter." *Arizona*, 132 S. Ct. at 2499.  To the extent that the Pennsylvania court was focused on the defendant's likely deportation following the imposition of the sentence, this collateral consequence could not result in an *unwarranted* disparity since the defendant's likely ineligibility for DAPA means that the defendant was not similarly situated to persons who are eligible.  Finally, even if the Pennsylvania court's concern were correct that the defendant was subject to potentially unequal enforcement of a criminal statute and faced prosecution in the Western District of Pennsylvania when he was unlikely to face prosecution in other districts, such enforcement disparities are inherent in prosecutorial discretion and have no bearing on the analysis under § 3553(a)(6), which requires consideration of *sentence* disparities among similarly situated defendants convicted of the same offense in federal court, not *enforcement* disparities.  *Accord United States v. Washington,* 670 F.3d 1321, 1327 (D.C. Cir. 2012) ("U.S. Attorney's lawful exercise of discretion in bringing a federal prosecution" rather than local prosecution, which may result in different sentences, does not  support a departure under § 3553(a)(6)); *United States v. Clark,* 8 F.3d 839, 842-843 (D.C. Cir. 1993)("reject[ing] the claim that the [U.S.] government's 'arbitrary use' of its discretion to indict defendants under either federal or D.C. law could be a mitigating circumstance within the meaning of § 3553(b)" or was appropriate to consider in exercise of district court's authority to avoid unwarranted sentencing disparities under § 3553(a)(6)).

still retain provisions for meaningful case-by-case review.[13]  *See* 2014 Guidance Memorandum at

4 (requiring that a DAPA applicant present "no other factors that, in the exercise of discretion,

make[] the grant of deferred action inappropriate").  This case-by-case decisionmaking

reinforces the conclusion that the challenged programs amount only to the valid exercise of

prosecutorial discretion and reflect the reality that "an agency decision not to enforce often

involves a complicated balancing of a number of factors which are peculiarly within its

expertise."  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

Finally, the challenged deferred action programs merely provide guidance to immigration

officials in the exercise of their official duties.  This helps to ensure that the exercise of deferred

action is *not* arbitrary and capricious, as might be the case if the executive branch offered no

guidance to enforcement officials.  It would make little sense for a Court to strike down as

arbitrary and capricious guidelines that help ensure that the Nation's immigration enforcement is

not arbitrary but rather reflective of congressionally-directed priorities.[14]

---

[13] Statistics provided by the defendants reflect that such case-by-case review is in operation.  As of December 5, 2014, 36,860 requests for deferred action under DACA were denied and another 42,632 applicants were rejected as not eligible.  Defs.' Mem., Ex. 22 (USCIS, Current Statistics: Deferred Action for Childhood Arrivals:  Pending, Receipts, Rejected, Approvals, and Denials (2014)), ECF No. 13-22.

[14] The plaintiff makes three arguments in support of his motion for preliminary injunction based on the constitutional principles underlying the separation of powers.  First, the plaintiff argues that the implementation of the challenged programs would use significantly all of the funds appropriated by Congress for immigration enforcement thereby frustrating the will of Congress.  *See* Hrg. Tr. at 16–17; Pl.'s Mot. at 20.  This is not so.  "[T]he costs of administering the proposed program would be borne almost entirely by USCIS through the collection of application fees."  OLC Opinion at 27; 2014 Guidance Memorandum at 5 ("Applicants will pay the work authorization and biometrics fees, which currently amount to $465.").  Should Congress disagree with the enforcement priorities set out by DHS in the challenged policies, Congress has the ability to appropriate funds solely for removal and the President cannot refuse to expend funds appropriated by Congress.  *See Train v. City of New York*, 420 U.S. 35 (1975).  Second, the plaintiff argues that the challenged deferred action programs violate *INS v. Chadha*, 462 U.S. 919 (1983), because the programs amount to unlawful legislation and/or rulemaking.  Pl.'s Mot. at 20.  This argument also misses the mark.  Congress has delegated authority to DHS to establish priorities for the enforcement of the nation's immigration laws, *see* 6 U.S.C. 202(5), and, as *Chadha* recognizes, DHS is acting in an Article II enforcement capacity when determining issues of deportation.  *See Chadha*, 462 U.S. at 953 n.16.  Third, the plaintiff contends that the challenged deferred action programs violate the non-delegation doctrine.  Pl.'s Mot. at 17.  Yet, a finding of excessive delegation of authority is extremely rare, given the low threshold that legislation must meet to overcome a non-delegation doctrine claim.  *See United States v. Ross*, 778 F. Supp. 2d 13, 26 (D.D.C. 2011) ("[o]nly twice in [the Supreme Court's] history, and not since 1935, has [it] invalidated a statute on the ground of excessive delegation of legislative authority") (citations and quotations omitted).  The Supreme Court has

Second, the plaintiff cannot demonstrate irreparable harm since the plaintiff waited two years to challenge the DACA program and because any harm to the plaintiff is likely to occur regardless of the challenged policies.

Finally, both the public interest and the balance of the equities do not support a preliminary injunction. Halting these deferred action programs would inhibit the ability of DHS to focus on its statutorily proscribed enforcement priorities (national security, border security, and public safety) and would upset the expectations of the DACA program's participants and the potentially eligible participants in the other challenged programs when none of those participants are currently before this Court.

## IV.   CONCLUSION

For the foregoing reasons, the plaintiff's motion for preliminary injunction is denied and the defendant's motion to dismiss for lack of subject matter jurisdiction is granted.

An appropriate Order accompanies this Memorandum Opinion.


Date: December 23, 2014


_____
BERYL A. HOWELL
United States District Judge

---

"'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'"  *Mich. Gambling Opposition v. Kempthorne*, 525 F.3d 23, 30 (D.C. Cir. 2008) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474-75 (2001)).

Exhibit 2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOSEPH M. ARPAIO, *Sheriff, Maricopa County, Arizona*,<br><br>                    Plaintiff,<br><br>                    v.<br><br>BARACK OBAMA, *in his individual and professional capacity as President, United States of America, et al.*,<br><br>                    Defendants. | Civil Action No. 14-1966 (BAH)<br><br>Judge Beryl A. Howell |

## <u>ORDER</u>

Upon consideration of the defendants' motion to dismiss for lack of subject matter jurisdiction, ECF Nos. 13, 15, and the plaintiff's motion for preliminary injunction, ECF No. 7, the related legal memoranda in support and in opposition, the declarations attached thereto, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that, because the Court lacks subject matter jurisdiction over this matter, the defendants' motion to dismiss is **GRANTED**; and it is further

**ORDERED** that the plaintiff's motion for preliminary injunction is DENIED;[1] and it is further

---

[1] The plaintiff's motion for a preliminary injunction docketed at ECF No. 6 is DENIED as moot.

**ORDERED** that the Clerk of the Court close this case.

**SO ORDERED**

Date: December 23, 2014

*This is a final and appealable Order.*


_____
BERYL A. HOWELL
United States District Judge