## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| JOSEPH ARPAIO, | |
|                  Appellant-Plaintiff, | Case No. on Appeal:  14-5325 |
|     v. | |
| BARACK OBAMA, ET AL. | |
|                  Appellees-Defendants. | Appeal from  U.S. District Court<br>Case No. 1:14-cv-01966 (BAH) |

## APPELLANT'S MOTION FOR EXPEDITED SCHEDULING OF APPEAL

## I.     INTRODUCTION

Appellant Sheriff Joe Arpaio ("Appellant"), by counsel, respectfully moves this Court pursuant to 28 U.S. Code § 1657(a); Rule 47.2 of the Circuit Rules of the U.S. Court of Appeals for the District of Columbia Circuit ("Circuit Rules"); and Rule 2 of the Federal Rules of Appellate Procedure ("FRAP") to further accelerate the briefing schedule for this appeal.

Appellees would not be harmed by an expedited decision.  Having a decision as early as possible would assist both parties in having a decision before, rather than after, the Appellees expending considerable time, effort, resources, and expense.

For example, the Department of Homeland Security ("DHS") is required to begin accepting applications _no later than_ February 19, 2015, which means that an enormous amount of planning and work will need to be done right now over the Christmas holidays and during January, to be ready for February 19, 2015.

Some aspects of the challenged programs have gone into effect already. DHS is required to suspend enforcement immediately, as of November 20, 2014. That abrupt change requires guidance, establishment of criteria, training, planning, and coordination that needs to be occurring right now.  The entire enforcement mechanism of DHS, including the U.S. Customs and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE") must abruptly undergo a massive change to stop enforcing the immigration laws and then seek to understand precisely and apply the new criteria so as to exempt from enforcement, even for deportations already imminent, anyone who might potentially qualify for these new programs.

A new program granting amnesty to at least 1 million more illegal aliens is scheduled to begin accepting applications for the granting of amnesty **_no later than_ February 19, 2015.**

A new program granting amnesty to at approximately 4 million additional illegal aliens is scheduled to begin accepting applications for the granting of **amnesty _no later than_** **May 20, 2015,** which requires the Appellees to finalize and

publish application guidelines, forms, etc.

## II.    SUMMARY OF RELIEF REQUESTED

A minute order in the Court of Appeals' Electronic Court Filing (ECF)

system, announced the CLERK'S ORDER filed [1529291] entered on 12/29/2014

at 9:15:43 AM EST and filed on 12/29/2014, directing party to file initial

submissions as follows:

- APPELLANT docketing statement due 01/28/2015.
- APPELLANT certificate as to parties, etc. due 01/28/2015.
- APPELLANT statement of issues due 01/28/2015.
- APPELLANT underlying decision due 01/28/2015.
- APPELLANT deferred appendix statement due 01/28/2015.
- APPELLANT notice of appearance due 01/28/2015.
- APPELLANT transcript status report due 01/28/2015.
- APPELLANT procedural motions due 01/28/2015.
- APPELLANT dispositive motions due 02/12/2015;

And the CLERK'S ORDER filed [1529291] directing party to file initial

submissions:

- APPELLEE certificate as to parties, etc. due 01/28/2015.
- APPELLEE entry of appearance due 01/28/2015.
- APPELLEE procedural motions due 01/28/2015.
- APPELLEE dispositive motions due 02/12/2015.

Appellant proposes modifying the scheduling Order directing party to file

initial submissions:

- APPELLANT docketing statement proposed due 01/9/2015.

- APPELLANT certificate as to parties, etc. proposed due 01/9/2015.
- APPELLANT statement of issues proposed due 01/9/2015.
- APPELLANT underlying decision proposed due 01/9/2015.
- APPELLANT deferred appendix statement proposed due 01/12/2015.
- APPELLANT transcript status report proposed due 01/12/2015.
- APPELLANT procedural motions proposed due 01/19/2015.
- APPELLANT dispositive motions proposed due 01/23/2015.

Appellant proposes modifying the scheduling Order directing party initial submissions:

- APPELLEE certificate as to parties, etc. proposed due 01/9/2015.
- APPELLEE procedural motions proposed due 01/19/2015.
- APPELLEE dispositive motions proposed due 01/23/2015.

Furthermore, Appellant proposes modifying the scheduling Order directing parties to file briefs as follows:

- APPELLANT files Appellant's brief proposed due on January 29, 2015.
- APPELLANT files Appendix proposed due on January 29, 2015. (Note that the entire record, even if all documents are in the Appendix, is minimal.).
- APPELLEE files Appellee's opposition brief proposed due on February 9, 2015.
- APPELLANT files Appellant's reply brief proposed due on February 13, 2015.

For ORAL ARGUMENT, Appellant requests, as suggested by the local practice manual and Circuit Rules, that the case be considered in the pool allowing the use of cancelled or rescheduled oral argument slots to be used to get the earliest

4

possible date for oral argument.  Appellant further requests that the this Court

schedule oral argument as soon as possible, mindful of the fact that the Appellees

are required under Appellee Secretary of Homeland Security Jeh Johnson

("Secretary Johnson")'s November 20, 2014 Memorandum order to begin

accepting applications for the expanded Deferred Action for Childhood Arrivals

("DACA") program no later than February 19, 2015.

### III.    PROCEDURAL HISTORY

Appellant filed his Complaint on November 20, 2014 before the U.S.

District Court for the District of Columbia ("District Court").

On December 4, 2014, Appellant filed a Motion for Preliminary Injunction

to stay implementation and further implementation of the Appellees' challenged

programs.

The District Court inquired by Minute Order whether the Appellees elected

to treat part of their opposition to the Motion for Preliminary Injunction as a

Federal Rules of Civil Procedure ("FRCP") Rule 12(b)(1) Motion to Dismiss for

lack of subject matter jurisdiction based upon standing.

On December 15, 2014, Appellees filed their Opposition to the Motion for

Preliminary Injunction and FRCP Rule 12(b)(1) Motion to Dismiss for lack of

standing.

On December 17, 2014, Appellant requested leave to present live testimony

in the hearing to present facts in support of standing. The District Court denied the motion but granted leave for Appellant to file a supplemental affidavit instead.

On December 18, 2014, Appellant filed a Reply responding to the FRCP Rule 12(b)(1) Motion to Dismiss and presenting other clarification.

The District Court held a hearing on December 22, 2014, on Appellant's Motion for Preliminary Injunction and Appellees' Motion to Dismiss under FRCP Rule 12(b)(1) for lack of standing.

The District Court issued a Memorandum Opinion and Order dismissing the Appellant's case for lack of standing on December 23, 2014.

## IV.     STANDARD OF REVIEW / GOVERNING LAW

28 U.S. Code § 1657 provides:

> (a) Notwithstanding any other provision of law, each court of the United States shall determine the order in which civil actions are heard and determined, except that the court shall expedite the consideration of any action brought under chapter 153 or section 1826 of this title, ***any action for temporary or preliminary injunctive relief, or any other action if good cause therefor is shown.*** For purposes of this subsection, "good cause" is shown if a right under the Constitution of the United States or a Federal Statute (including rights under section 552 of title 5) would be maintained in a factual context that indicates that a request for expedited consideration has merit.

> (b) The Judicial Conference of the United States may modify the rules adopted by the courts to determine the order in which civil actions are heard and determined, in order to establish consistency among the judicial circuits.

(emphasis added).

Similarly, FRAP Rule 2 "Suspension of Rules," provides:

> On its own or a party's motion, a court of appeals may—to expedite its decision or for other good cause—suspend any provision of these rules in a particular case and order proceedings as it directs, except as otherwise provided in Rule 26(b).

Circuit Rule 47.2 provides:

Appeal Expedited by Statute; Habeas Corpus Proceeding; Sentencing Appeal

> (a) Appeal Expedited by Statute and Habeas Corpus Proceeding. Upon filing a notice of appeal in a case invoking 18 U.S.C. § 3145 or § 3731, 28 U.S.C. chapter 153, or 28 U.S.C. § 1826, the appellant must so advise the clerks of this court and of the district court immediately both orally and by letter. ***Pursuant to 28 U.S.C. § 1657, this practice will also be followed in an action seeking temporary or preliminary injunctive relief.*** In such cases, the clerk of the district court must transmit a copy of the notice of appeal and a certified copy of the docket entries to the clerk of this court forthwith. The clerk of this court will thereupon enter the appeal upon the docket and prepare an expedited schedule for briefing and argument. If a hearing occurred, appellant must order the necessary portions of the transcript on an expedited basis and make arrangements with the clerk of the district court for prompt transmittal of the record to this court.
> * * *

(emphasis added).

## V.     CHALLENGED PROGRAMS HAVE ALREADY STARTED

### A. JUNE 15, 2012, DACA ALREADY IN FORCE

The Appellees' so-called "Deferred Action for Childhood Arrivals"

("DACA") was ordered by then Secretary Janet Napolitano in a Memorandum to

the DHS on June 15, 2012, and is already active and in operation. *See* Exhibit A to

Appellant's Motion for Preliminary Injunction (attached hereunder as Exhibit 1).
This DACA program is on-going.

However, because the DACA program initially granted deferred action
status for two (2) years, nearly 1 million DACA recipients are just now renewing
their DACA status.  Therefore, DHS will need to process nearly 1 million DACA
renewals now and within the next few months.  A quick decision whether the
DACA program is lawful would be prudent.

**B.  IMMEDIATE SUSPENSION OF ENFORCEMENT HAS ALREADY
    BEGUN**

On November 20, 2014, by a barrage of memoranda from Secretary Johnson
containing various orders, issued at President Barack Obama's order, Appellees
both expanded and extended DACA to new categories of "childhood arrivals" as
well as to citizens of foreign countries illegally present in the United States who
are parents of U.S. citizens or of Lawful Permanent Residents (("LPRs"), typically
green card holders), as well as created other programs giving amnesty and/or other
benefits to illegal aliens.

The programs created by the November 20, 2014 Memoranda orders took
place immediately and are already in effect with regard to suspending enforcement
activities of any citizen of another country who might qualify for the new
programs.

In the main Memoranda in dispute within the instant case, on November 20,

2014, Secretary Johnson issued a Memoranda Order titled *"Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who are the Parents of U.S. Citizens or Permanent Residents"* to the U.S. Citizenship and Immigration Services ("USCIS"), ICE, Customs and Border Protection (CBP), and Acting Assistant Secretary for Policy Alan D. Bersin, a copy of which was attached as Exhibit D to the Appellant's Motion for Preliminary Injunction (attached hereunder as Exhibit 2).

Said Memoranda includes the following orders to the DHS:

As with DACA, the above criteria are to be considered *for all individuals encountered* by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, *whether or not the individual is already in removal proceedings or subject to a final order of removal*. Specifically:

• ICE and CBP are instructed to *immediately begin identifying persons in their custody*, as well as *newly encountered individuals*, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

• ICE is further instructed *to review pending removal cases*, and seek administrative *closure or termination of the cases of individuals identified who meet the above criteria*, and to refer such individuals to USCIS for case-by-case determinations. ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

• USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear. The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

(emphases added).

   As a result, the DHS was ordered to immediately change the immigration laws and practices of the U.S. Government, effective November 20, 2014. There is no limitation in the Memoranda as to the orders by the Secretary to departmental employees and officials being implemented in the future rather than immediately. But the legal force of the Memoranda is immediate and would require the DHS to begin implementation immediately.

## C. EXPANSION OF DACA STARTS *NO LATER THAN* FEBRUARY 19, 2015

   With regard to the expansion of DACA to new categories of childhood arrivals, the November 20, 2014, Memoranda order on pages 3-4 that:

> In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:
>
> **Remove the age cap**. * * *
>
> **Extend DACA renewal and work authorization to three-years**. * * *
>
> **Adjust the date-of-entry requirement.** * * *
>
> USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.
>
>            * * *

   As a result, the expansion of DACA will begin no later than February 19,

2015, the _latest_ date upon which USCIS may "begin accepting applications under the new criteria."  The expansion of DACA must begin accepting applications no later than 90 days after November 20, 2014.

Quite obviously, to begin accepting applications no later than February 19, 2015, the Department must be undertaking a great many actions at a frenetic pace between now and February 19, 2015.  In order for DHS to begin accepting applications no later than February 19, 2015, there must be applications for applicants to obtain, fill out, and file, and an entire plan regarding those applications and how they will be processed and handled.

### D. EXPANSION OF "DEFERRED ACTION" (EXTENSION OF DACA TO PARENTS) STARTS _NO LATER THAN_ MAY 20, 2015

With regard to the expansion of deferred action to parents, the November 20, 2014 Memoranda, attached as Exhibit D to Appellant's Complaint (attached hereunder as Exhibit 2), orders:[1]

> I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:
> * * *
> [Criteria listed]
> * * *

---

[1]      See Page 5 of Secretary Jeh Johnson's November 20, 2014, Memorandum Order titled _"Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who are the Parents of U.S. Citizens or Permanent Residents"_ to the USCIS, ICE, Customs and Border Protection (CBP), and Acting Assistant Secretary for Policy Alan D. Bersin, a copy of which wass attached as Exhibit D to the Motion for Preliminary Injunction (attached hereunder as Exhibit 2).

> USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement.

As a result, the expansion of "deferred action" to parents will begin no later than May 20, 2015, the _latest_ date upon which USCIS may "begin accepting applications from eligible applicants."  The expansion of DACA must begin accepting applications no later than 180 days after November 20, 2014.

Quite obviously, to begin accepting applications no later than May 20, 2015, the Department must immediately and at this very moment be undertaking a great many actions at a frenetic pace between now and May 20, 2015.  In order for DHS to begin accepting applications no later than May 20, 2015, there must be applications for applicants to obtain, fill out, and file, and an entire plan regarding those applications and how they will be processed and handled.

## VI.    APPELLEES NOW HIRING 1,000 NEW WORKERS IN CRYSTAL CITY

Moreover, Appellees have already leased office work space in Crystal City (Arlington, Virginia) for 1,000 new DHS workers [2] to process the roughly 5 million applications expected.  The Government will be immediately spending money on these programs.  The constitutionality and legality of these programs should be decided first.

---

[2]    "**Homeland Security already hiring 1,000 employees to carry out Obama amnesty**," by Stephen Dinan, <u>The Washington Times</u>, December 3, 2014, http://www.washingtontimes.com/news/2014/dec/3/dhs-hiring-1000-employees-carry-out-obama-amnesty/

Similarly, the <u>Washington Times</u> is reporting that the Obama Administration has already posted job openings –formal requests for applications – for 1,000 new government workers with salaries up to $157,000 per year to process amnesty requests for approximately 6 million illegal aliens.  DHS has already leased space in Arlington, Virginia, for these 1,000 new bureaucrats to do their work processing applications.

Therefore, government resources may be wasted if the programs proceed but are later found to be invalid legally or unconstitutional.

## VII.  IMMEDIATE MAGNET – RECREATING BORDER CRISIS OF SUMMER 2014

Furthermore, the November 20, 2014 "Executive Action" or "Executive Order Amnesty" creates an immediate magnet for millions more illegal aliens to rush the border.

The world watched as a shocking crisis unfolded at the U.S.-Mexican border over the summer of 2014 – long after the June 15, 2012, DACA program gave amnesty to childhood arrivals.  Tens of thousands of children from Central America who crossed illegally into Mexico across Mexico's Southern border rode on top of a dangerous freight train called "the beast." [3]  Some children lost limbs or

---

[3]     "La Bestia" or "The Beast" is obviously not only one physical train, but refers generally to the train route along which regular freight trains travel from time to time, affording the opportunity for migrants from Central America or even

their lives jumping on to the train or while riding on it.  Other children were raped or abused or turned into slaves or diverted to sex trafficking.  No one knows how many of those children died in the desert attempting to reach the United States.

Delaying a quick decision on this dispute could help create an "attractive nuisance" and magnet likely to create a similar humanitarian crisis in the spring of 2015 as the weather warms, and particularly before the heat of Summer arrives.

While the primary cause is Appellees' actions, it is an unfortunate factor that delaying a decision, if the programs will ultimately be found to be unlawful, could regrettably contribute to another humanitarian disaster at the U.S.-Mexican border in 2015.

Particularly since Appellees' deferred action programs are illegal and/or unconstitutional, the sooner a decision is reached, the better.

Believing that anyone who touches U.S. soil – in a new "dry feet" policy – will be granted a job and eventually U.S. citizenship, more illegal aliens will immediately start to arrive.  This is especially true because the Obama and Bush Administrations did not build the border fence mandated by the Border Fence Act of 2006.

The unaccompanied minors who arrived in the summer of 2014 were distributed throughout the country.  In so doing, they widely scattered an epidemic

_____

Mexicans to climb on and ride on the top of the trains illegally, dangerously, and without paying as passengers.  Boarders often jump on in the interior of Mexico.

of Enterovirus D68 and most likely hepatitis. DHS caused much of this problem by concentrating arrivals cooped up in detention centers, so that if only one person was infected many others would catch a disease incubated in DHS centers, before quickly distributing these arrivals nationwide prior to completing effective quarantine periods to watch for disease.

## VIII. APPELLANT WILL SUFFER IRREPARABLE INJURY FROM DELAY

Courts have consistently held that a colorable constitutional violation gives rise to a showing of irreparable harm. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (a constitutional violation and loss of constitutional protections "'for even minimal periods of time, unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)); *see also Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 (D.D.C. 2002) (deprivation of constitutional protection "is an undeniably substantial and irreparable harm").

Allowing the Executive Branch to immediately implement the President's DACA and Executive Amnesty programs will cause irreparable harm, including to those illegal aliens the programs seek to enroll, if the Federal courts later determine the programs to be unlawful.

Sheriff Arpaio's office and deputies, as illustrated in the Exhibits attached to the Complaint, will suffer the loss of resources and funding diverted to handle the flood of increased illegal immigration, the danger to deputies enforcing the law,

15

and increase crime in his Maricopa County.  As set forth in Sheriff Arpaio's

Declaration, real-world experience has demonstrated this.  Those who cross the

border without resources, without a job, without a bank account, and without a

home in the U.S., who are willing to break the law to achieve their purposes, and

who are released from any social stigma in their home communities where they are

known are correlated with an increase in crime in Maricopa County, Arizona. This

includes when they cross through Arizona.

        Citizens of other countries who are present in the United States unlawfully

will be asked to pay fees of at least $465 each to the DHS and to change their

circumstances in many ways in reliance upon Appellees' executive action

programs.  To unravel the changed circumstances later would be an inexcusable

unfairness to all concerned, including illegal aliens acting in reliance on and

trusting in Appellees' programs.  Fees of $465 and up would have to be refunded

to millions of individuals.  The work and expenses incurred by the Executive

Branch would be wasted by the federal government on a mass scale.

        Furthermore, news of Appellees' programs will serve as an invitation for

millions of more trespassers to enter the country.  Postponing the start of

Appellees' executive action programs may not entirely cancel that message, but it

will reduce the encouragement for others to enter the country without first testing

the legality of these programs.

## IX.  <u>CONCLUSION</u>

For the foregoing reasons, this Court should respectfully accelerate the timetable for briefing, hearing, and decision upon Appellant's appeal as set forth above.

Appellant's counsel contacted counsel for the Government today, and they authorized Appellant to state that they oppose the schedule proposed by Appellant, and will file a written response shortly after the motion is filed.

Dated: January 6, 2015

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
D.C. Bar No. 334581
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W., Suite 345
Washington, D.C. 20006
Tel: (310) 595-080
Email: leklayman@gmail.com

*Attorney for Plaintiff-Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 6th day of January, 2015 a true and correct copy of the foregoing was submitted electronically to the U.S. Court of Appeals for the District of Columbia Circuit and served via CM/ECF electronic service upon the following:

> Scott R.McIntosh, Esq.
> Jeffrey Clair, Esq.
> William Havemann, Esq.
> U.S. DEPARTMENT OF JUSTICE
> Civil Division, Appellate Staff
> 950 Pennsylvania Avenue, N.W.  Room 7259
> Washington, D.C. 20530-0001
> Scott.McIntosh@usdoj.gov
> Jeffrey.Clair@usdoj.gov
> William.E.Havemann@usdoj.gov
>
> *Attorneys for Defendants-Appellees*

> Respectfully submitted,
> */s/ Larry Klayman*
> Larry Klayman, Esq.
> D.C. Bar No. 334581
> Freedom Watch, Inc.
> 2020 Pennsylvania Avenue N.W., Suite 345
> Washington, D.C. 20006
> Tel: (310) 595-080
> Email: leklayman@gmail.com
>
> *Attorney for Plaintiff-Appellant*

Exhibit 1



**U.S. Department of Homeland Security**
Washington, DC 20528

**Homeland Security**

June 15, 2012

MEMORANDUM FOR:     David V. Aguilar
Acting Commissioner, U.S. Customs and Border Protection

Alejandro Mayorkas
Director, U.S. Citizenship and Immigration Services

John Morton
Director, U.S. Immigration and Customs Enforcement

FROM:     Janet Napolitano
Secretary of Homeland Security

SUBJECT:     Exercising Prosecutorial Discretion with Respect to Individuals
Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

Exhibit 2

*Secretary*
U.S. Department of Homeland Security
Washington, DC 20528



**Homeland Security**

November 20, 2014

MEMORANDUM FOR:   León Rodríguez
                  Director
                  U.S. Citizenship and Immigration Services

                  Thomas S. Winkowski
                  Acting Director
                  U.S. Immigration and Customs Enforcement

                  R. Gil Kerlikowske
                  Commissioner
                  U.S. Customs and Border Protection

FROM:             Jeh Charles Johnson
                  Secretary

SUBJECT:          **Exercising Prosecutorial Discretion with Respect to
                  Individuals Who Came to the United States as
                  Children and with Respect to Certain Individuals
                  Who Are the Parents of U.S. Citizens or Permanent
                  Residents**

   This memorandum is intended to reflect new policies for the use of deferred action. By memorandum dated June 15, 2012, Secretary Napolitano issued guidance entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*. The following supplements and amends that guidance.

   The Department of Homeland Security (DHS) and its immigration components are responsible for enforcing the Nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. Secretary Napolitano noted two years ago, when she issued her prosecutorial discretion guidance regarding children, that "[o]ur Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case."

1

Deferred action is a long-standing administrative mechanism dating back decades, by which the Secretary of Homeland Security may defer the removal of an undocumented immigrant for a period of time.[1]  A form of administrative relief similar to deferred action, known then as "indefinite voluntary departure," was originally authorized by the Reagan and Bush Administrations to defer the deportations of an estimated 1.5 million undocumented spouses and minor children who did not qualify for legalization under the *Immigration Reform and Control Act* of 1986.  Known as the "Family Fairness" program, the policy was specifically implemented to promote the humane enforcement of the law and ensure family unity.

Deferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission.  As an act of prosecutorial discretion, deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion. Deferred action does not confer any form of legal status in this country, much less citizenship; it simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States.  Nor can deferred action itself lead to a green card.  Although deferred action is not expressly conferred by statute, the practice is referenced and therefore endorsed by implication in several federal statutes.[2]

Historically, deferred action has been used on behalf of particular individuals, and on a case-by-case basis, for classes of unlawfully present individuals, such as the spouses and minor children of certain legalized immigrants, widows of U.S. citizens, or victims of trafficking and domestic violence.[3]  Most recently, beginning in 2012, Secretary Napolitano issued guidance for case-by-case deferred action with respect to those who came to the United States as children, commonly referred to as "DACA."

---

[1]  Deferred action, in one form or another, dates back to at least the 1960s.  "Deferred action" per se dates back at least as far as 1975. *See,* Immigration and Naturalization Service, Operation Instructions § 103.1(a)(1)(ii) (1975).

[2]  INA § 204(a)(1)(D)(i)(II), (IV) *(Violence Against Women Act (VAWA) self-petitioners not in removal proceedings are "eligible for deferred action and employment authorization");* INA § 237(d)(2) *(DHS may grant stay of removal to applicants for T or U visas but that denial of a stay request "shall not preclude the alien from applying for . . . deferred action");* REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13 *(requiring states to examine documentary evidence of lawful status for driver's license eligibility purposes, including "approved deferred action status");* National Defense Authorization Act for Fiscal Year 2004 § 1703(c) (d) Pub. L. 108-136 *(spouse, parent or child of certain U.S. citizen who died as a result of honorable service may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization").*

[3]  In August 2001, the former-Immigration and Naturalization Service issued guidance providing deferred action to individuals who were eligible for the recently created U and T visas.  Two years later, USCIS issued subsequent guidance, instructing its officers to use existing mechanisms like deferred action for certain U visa applicants facing potential removal.  More recently, in June 2009, USCIS issued a memorandum providing deferred action to certain surviving spouses of deceased U.S. citizens and their children while Congress considered legislation to allow these individuals to qualify for permanent residence status.

2

By this memorandum, I am now expanding certain parameters of DACA and issuing guidance for case-by-case use of deferred action for those adults who have been in this country  since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities, as set forth in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum.

The reality is that most individuals in the categories set forth below are hard-working people who have become integrated members of American society. Provided they do not commit serious crimes or otherwise become enforcement priorities, these people are extremely unlikely to be deported given this Department's limited enforcement resources—which must continue to be focused on those who represent threats to national security, public safety, and border security.  Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted.

### A.    Expanding DACA

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis.  The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years.  On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.**  DACA will apply to all otherwise eligible immigrants who entered the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today.  The current age restriction excludes those who were older than 31 on the date of announcement (*i.e.*, those who were born before June 15, 1981).  That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years**.  The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments.  This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014.  Beginning on that date, USCIS should issue all work

3

authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the renewal of their DACA grants. USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.** In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.

## B.    Expanding Deferred Action

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

- have no lawful status on the date of this memorandum;

- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above. Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants. Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of

4

the Immigration and Nationality Act.[4]  Deferred action granted pursuant to the program shall be for a period of three years.  Applicants will pay the work authorization and biometrics fees, which currently amount to $465.  There will be no fee waivers and, like DACA, very limited fee exemptions.

USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement.  As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal.  Specifically:

- ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

- ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations.  ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.  The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.

This memorandum confers no substantive right, immigration status or pathway to citizenship.  Only an Act of Congress can confer these rights.  It remains within the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law.  This memorandum is an exercise of that authority.

---

[4] INA § 274A(h)(3), 8 U.S.C. § 1324a(h)(3) ("As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the[Secretary]."); 8 C.F.R. § 274a.12 (regulations establishing classes of aliens eligible for work authorization).