**No. 14-5325**

_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

JOSEPH M. ARPAIO,

Plaintiff-Appellant,

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, et al.,

Defendants-Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BRIEF FOR THE APPELLEES

_____

BENJAMIN C. MIZER
 Acting Assistant Attorney General

RONALD C. MACHEN JR.
 United States Attorney

BETH S. BRINKMANN
 Deputy Assistant Attorney General

SCOTT R. MCINTOSH
JEFFREY CLAIR
 (202) 514-4028
WILLIAM E. HAVEMANN
 (202) 514-8877
 Attorneys, Civil Division
 Room 7243, Department of Justice
 950 Pennsylvania Ave., N.W.
 Washington, D.C. 20530

_____
_____

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.  <u>Parties and Amici.</u>

Plaintiff-Appellant is Joseph M. Arpaio, Sheriff of Maricopa County, Arizona. The Defendants-Appellants are Barack Obama, President of the United States, Jeh Johnson, Secretary of Homeland Security, Leon Rodriguez, Director of U.S. Citizen and Immigration Services, and Eric Holder, Jr., Attorney General.

B.  <u>Rulings under Review.</u>

Appellant seeks review of the district court's opinion and order denying a motion for preliminary injunction and dismissing the case for lack of jurisdiction in *Arpaio* v. *Obama, et al.*, No. 14-01966 (D.D.C. Dec. 23, 2014).

C.  <u>Related Cases.</u>

This matter has not previously been before this Court.  A suit challenging some of the same policies at issue in this appeal is pending in the United States District Court for the Southern District of Texas.  *See State of Texas*, *et al.* v. *United States*, *et al.*, No. 1-14-CV-254 (S.D. Tex.).  The district court entered a preliminary injunction against the policies in that litigation, *see id*, order of Fed. 16, 2015, and an appeal of the preliminary injunction is pending.  *Id.*, No. 15-40238 (5th Cir.).

/s/ Jeffrey Clair, Attorney
U.S. Dept. of Justice
jeffrey.clair@usdoj.gov
(202) 514-4028

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES

GLOSSARY……………………………………………………………………..ix

INTRODUCTION.................................................................................. 1

STATEMENT OF JURISDICTION ..................................................... 5

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW.............................. 5

STATEMENT OF THE CASE ............................................................. 6

    A.    Statutory Scheme:  Immigration Enforcement and Prosecutorial Discretion ................................................................ 6

    B.    Deferred Action for Childhood Arrivals and for Parents of U.S. Citizens and of Lawful Permanent Residents................................ 12

    C.    District Court Proceedings.............................................. 17

SUMMARY OF ARGUMENT ............................................................ 21

STANDARD OF REVIEW.................................................................. 23

ARGUMENT........................................................................................ 23

    I.    Plaintiff Lacks Standing to Challenge The Secretary's Deferred Action Policies For the Exercise of Prosecutorial Discretion In The Enforcement Of Federal Immigration Law.................................. 23

        A.    Plaintiff Did Not Allege a Concrete and Particularized Injury In Fact.................................................................... 25

        B.    Plaintiff's Claimed Injury Is Not Fairly Traceable To The Secretary's Deferred Action Policies ................................ 32

        C.    Plaintiff's Claimed Injury Is Not Judicially Redressable .............. 37

i

        D.      Prudential Considerations Weigh Against Entertaining
             Plaintiff's Disagreement With Federal Immigration Policy .......... 39

    II.    Plaintiff Has Not Demonstrated Likelihood Of Success On
         The Merits Or That The Balance Of Harms And Public
         Interest Warrant Issuance Of A Preliminary Injunction ......................... 42

        A.      Plaintiff Has Not Demonstrated A Likelihood Of Success
             On The Merits ................................................................... 44

        B.      Plaintiff's Vague And Conclusory Allegations Of Harm
             Do Not Establish Irreparable Injury ................................................. 54

        C.      The Harm To Third Parties, The Government, And The Public
             Interest Weigh Against Issuance Of A Preliminary Injunction ... 55

CONCLUSION ........................................................................................ 57

FRAP 32(A)(7) CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                                                 **Page**

*Aamer* v. *Obama*, 742 F.3d 1023 (D.C. Cir. 2014) ............................................................ 43

*Abdullah* v. *Obama*, 753 F.3d 193 (D.C. Cir. 2014) ........................................................ 43

*Allen* v. *Wright*, 468 U.S. 737 (1984) ............................................................................. 25

*American Hosp. Ass'n* v. *Bowen*, 834 F.3d 1037 (D.C. Cir. 1987) .................................... 51

*Ariz. Dream Act Coalition*, 757 F.3d 1053 (9th Cir. 2014) ............................................... 47

*Arizona* v. *United States*, 132 S. Ct. 2492 (2012) ......................................... 7, 36, 37, 41, 46

*Baker* v. *Carr*, 369 U.S. 186 (1962) ................................................................................. 40

*Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544 (2007) ......................................................... 32, 34

*Bennett* v. *Spear*, 520 U.S. 154 (1997) ............................................................................ 39

*Brock* v. *Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533 (D.C. Cir. 1986) ............................ 51

*California* v. *United States*, 104 F.3d 1086 (9th Cir. 1997) ............................................... 28

*Chamber of Commerce of the United States* v. *Whiting*, 131 S. Ct. 1968 (2011) ...................... 6

*Chamber of Commerce v. DOL*, 174 F.3d 206 (D.C. Cir. 1999) ............................... 51, 52, 53

*Chaplaincy of Full Gospel Churches* v. *England*, 454 F.3d 290 (D.C. Cir. 2006) ................. 54

*City of Los Angeles* v. *Lyons*, 461 U.S. 95 (1983) .............................................................. 30

\* *Clapper* v. *Amnesty Int'l USA,* 133 S. Ct. 1138 (2013) ......................................... 29, 30, 32

\* Authorities chiefly relied upon are marked with an asterisks

*Clarke* v. *Sec. Indus. Ass'n*, 479 U.S. 388 (1987).................................................. 45

*Coalition for Underground Expansion* v. *Mineta*, 333 F.3d 193 (D.C. Cir. 2003)................ 35

*Community for Creative Non-Violence* v. *Pierce*, 786 F.2d 1199 (D.C. Cir. 1986) ............... 49

*Crane* v. *Napolitano*, 920 F. Supp. 2d 724 (N.D. Tex. 2013), *appeal pending*, No. 14-10049 (5th Cir.) (argued Feb. 3, 2015) ........................................................... 8

*Fed'n. for Am. Immigration Reform* v. *Reno*, 93 F.3d 897 (D.C. Cir. 1997) .................27, 45

*Fiallo* v. *Bell*, 430 U.S. 787 (1977) ...................................................................... 40

*Franklin v. Massachusetts,* 505 U.S. 827 (1992) .................................................... 49

*Fraternal Order of Police* v. *United States,* 152 F.3d 998 (D.C. Cir. 1998) ......................... 26

*Free Ent. Fund* v. *Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138 (2010) .................... 48

*FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215 (1990) ........................................................ 35

*Haase* v. *Sessions*, 835 F.2d 902 (D.C. Cir. 1987)................................................... 35

*Harisades* v. *Shaugnessy*, 342 U.S. 580 (1952)...................................................... 41

* *Heckler* v. *Chaney*, 470 U.S. 821 (1985) ......................................................44, 48

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) ................................................. 49

*In re Endangered Species Act Section 4 Deadline Litigation*, 704 F.3d 972 (D.C. Cir. 2013) . 23

*Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 134 S. Ct. 1377 (2014)...............27, 45

* *Lincoln* v. *Vigil*, 508 U.S. 182 (1993) .........................................................51, 54

*Linda R.S.* v. *Richard D.*, 410 U.S. 614 (1973)...................................................25, 45

* *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555 (1992)........................................24, 28, 32

*Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987) .......................................... 51

iv

*Mathews* v. *Diaz*, 426 U.S. 67 (1976) ............................................................ 40

*Mendoza* v. *Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ...................................... 35

*Mills* v. *District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009) ................. 55

*Mississippi v. Johnson,* 4 Wall. 475 (1867) ................................................... 49

*Morton v. Ruiz,* 415 U.S. 199 (1974) ......................................................... 51, 52

*Nat'l Wrestling Coaches Ass'n* v. *Dep't of Educ.*, 366 F.3d 930 (D.C. Cir. 2004) ............... 32

*Natural Resources Defense Council* v. *EPA*, 643 F.3d 311 (D.C. Cir. 2011) .................... 32

*Natural Resources Defense Council* v. *EPA*, 755 F.3d 1010 (D.C. Cir. 2014) ................... 32

*New Jersey* v. *United States*, 91 F.3d 463 (3d Cir. 1996) .......................... 27, 48

*O'Shea* v. *Littleton*, 414 U.S. 488 (1974) ...................................................... 30

*Padavan* v. *United States*, 82 F.3d 23 (2d Cir. 1996) ................................... 27

*Papasan* v. *Allain*, 478 U.S. 265 (1986) ........................................................ 34

*Pennsylvania* v. *Kleppe*, 533 F.2d 668 (D.C. Cir. 1976) .............................. 41

*Raines* v. *Byrd*, 521 U.S. 811 (1997) .............................................................. 28

*Reno* v. *American Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ......... 7, 37, 50, 56

*Seminole Tribe of Fla.* v. *Florida*, 517 U.S. 44 (1996) ................................. 36

*Shaughnessy* v. *Mezei*, 345 U.S. 206 (1953) ................................................. 40

*Sherley* v. *Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ................................ 23, 42

* *Sure-Tan, Inc.* v. *NLRB*, 467 U.S. 883 (1984) .................................. 19,  25, 45

*Texas* v. *United States*, No. 15-254 (S.D. Tex. Feb. 16, 2015), *appeal pending,*
    No. 15-40238 (5th Cir.) ........................................................................ 28, 53

*Texas* v. *United States*, 106 F.3d 661 (5th Cir. 1997) .................................................28, 48

*United States Dep't of Labor* v. *Kast Metals Corp.*, 744 F.2d 1145 (5th Cir. 1984) ............ 51

*United States* v. *Cox*, 342 F.2d 167(5th Cir. 1965) (en banc)........................................... 49

*United States* v. *Nixon*, 418 U.S. 683, (1974) ........................................................ 49

*United States* v. *Texas*, 143 U.S. 621 (1892) ........................................................ 36

*United Transportation Union* v. *ICC*, 891 F.2d 908 (D.C. Cir. 1989) ................................ 32

*Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) ..................................................................... 24

*Warth* v. *Seldin*, 422 U.S. 490 (1975) ................................................................27, 39

*Washington Alliance of Technology Workers* v. *DHS*, No 14-526, 2014 WL 6537464 (D.D.C. Nov. 21, 2014) ................................................................................... 35

*Whitemore* v. *Arkansas*, 495 U.S. 149 (1990) ........................................................ 29

*Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ................................................. 43

*Wis. Gas Co. v. FERC.*, 758 F.2d 669 (D.C. Cir. 1985) ................................................... 54

**Constitution:**

Article III ................................................................................. 3, 5, 18, 19, 27, 28, 35, 38
Take Care Clause ............................................................................. 47, 49, 50, 55

**Statutes:**

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359............................................................................................... 10

Violence Against Women Act of 1994 Pub. L. No. 103-322, 108 Stat. 1796, 1902.. 10

Victims of Trafficking and Violence Protection Act of 2000 Pub. L. No. 106-386, 114 Stat. 1464........................................................................... 10

Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 ....................................................11, 47

Pub. L. No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694)........................................11, 47

Pub. L. No. 109-13, div. B, § 202(c)(2)(B)(viii), 119 Stat. 231, 302 ............................ 11

*DHS Appropriations Act 2010*, Pub. L. No. 111-83, 123 Stat. 2142 (2009) ............. 8, 38

*Consolidated Appropriations Act, 2014*, Pub. L. No. 113-76, div. F., Tit. II, 128
Stat. 5, 251 (2014) ..................................................................................................8, 38

5 U.S.C. § 553(b)(3)(A) ................................................................................................... 50
5 U.S.C. § 701(a)(1) ......................................................................................................... 44
5 U.S.C. § 702 .................................................................................................................. 44

6 U.S.C. § 202(5) ......................................................................................... 6, 37, 41, 46
6 U.S.C. §§ 271(b) 275, 552(a) & 557 ........................................................................... 12

8 U.S.C. § 1101 ........................................................................................................... 6, 44
8 U.S.C. § 1103(a) ........................................................................................................... 46
8 U.S.C. § 1103(a)(1) ........................................................................................................ 6
8 U.S.C. § 1103(a)(3) ........................................................................................................ 6
8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) ........................................................................11, 47
8 U.S.C. § 1182(a) ............................................................................................................. 6
8 U.S.C. § 1182(a)(2) ........................................................................................................ 6
8 U.S.C. § 1182(a)(3) ........................................................................................................ 6
8 U.S.C. § 1182(a)(6) ........................................................................................................ 6
8 U.S.C. § 1182(a)(7) ........................................................................................................ 6
8 U.S.C. § 1227(a)(1)(A) ................................................................................................... 7
8 U.S.C. § 1227(a)(1)(A)(C) .............................................................................................. 7
8 U.S.C. § 1227(a)(2) ........................................................................................................ 6
8 U.S.C. § 1227(a)(3) ........................................................................................................ 6
8 U.S.C. § 1227(a) ............................................................................................................. 6
8 U.S.C. § 1227(a)(1)(B) ................................................................................................... 6
8 U.S.C. § 1227(a)(1)(C) ................................................................................................... 6
8 U.S.C. § 1324a(h)(3) ...................................................................................12, 17, 46, 47

28 U.S.C. § 1291 ................................................................................................................ 5
28 U.S.C. § 1331 ................................................................................................................ 5

49 U.S.C. § 30301 ........................................................................... 11, 35

## Regulations

8 C.F.R. § 274a.12(c)(14) ............................................... 12, 14, 17, 46

46 Fed. Reg. 25, 079, 25,081 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## Rules:

Rule 12 (b) (1) .............................................................................. 35
Rule 12 (b)(6) .............................................................................. 34

## Legislative Materials:

H.R. Rep. No. 111-157, 111th Cong., 1st Sess. (2009)............................................ 9, 38

## Miscellaneous:

Charles Alan Wright and Arthur R. Miller, 5B *Federal Practice and Procedure*, Civ. § 1357 (3d ed. 2004 & Supp. 2014................................................................. 34

Cong. Research Service, *Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration* http://fas.org/sgp/crs.homesec/R43628.pdf> (July 3, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ....33-34

Office of Legal Counsel, *DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* at 9 (Nov. 19, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*USCIS, Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices* at 3 (2012) ................................................................... 7

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CR | Clerk's Notation of Record |
| DACA | Deferred Action for Childhood Arrivals |
| DAPA | Deferred Action for Parents of U.S. Citizens of Lawful Permanent Residents |
| DHS | Department of Homeland Security |
| INS | Immigration and Naturalization Service |
| JA | Joint Appendix |
| Secretary | Secretary of Homeland Security |

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 14-5325

————————————

JOSEPH M. ARPAIO,

Plaintiff-Appellant,

v.

BARACK OBAMA, PRESIDENT OF THE UNITED STATES, et al.,

Defendants-Appellees.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————

BRIEF FOR THE APPELLEES

————————————

## INTRODUCTION

In this case, a local sheriff has brought suit in an effort to assert control over nationwide federal immigration enforcement policies with which he disagrees. The district court correctly held that plaintiff lacks standing to pursue this dispute in federal court. The court also correctly reasoned that, even if there were standing, no preliminary injunction would issue because plaintiff could not meet any of the necessary requirements.

1

The Secretary of Homeland Security has announced guidelines for the exercise of prosecutorial discretion in the enforcement of the immigration laws that concentrate the government's limited resources on border security and on removing aliens who pose a threat to public safety or national security.  To further these objectives, the guidelines provide that immigration officials, in the exercise of their discretion and on a case-by-case basis, may defer action on enforcement against certain aliens who were brought here as children, as well as certain aliens who are the parents of U.S. citizens or of lawful permanent residents, if the aliens have longstanding ties to the United States, do not have disqualifying criminal convictions, meet other threshold criteria, and otherwise merit the official's exercise of prosecutorial discretion.

Deferred action is a longstanding immigration practice that has been recognized by the Supreme Court and relied on by Congress.  It does not confer any substantive right or legal immigrant status on an alien, and it does not establish a pathway to lawful permanent residence or citizenship.  It is instead a tool for allocating the government's limited resources and informing the government's enforcement efforts in light of the overwhelming number of immigration violations faced by the Department of Homeland Security, humanitarian considerations, and other factors.  Deferred action can be revoked by the Secretary at any time at the Secretary's unfettered discretion and removal proceedings initiated or continued against the alien.

Plaintiff, the sheriff of Maricopa County, Arizona, disagrees with these discretionary enforcement policies and seeks to air his grievance in federal court. Article III of the Constitution, however, limits federal jurisdiction to cases and controversies. It does not provide jurisdiction over a generalized complaint that federal immigration policy is misguided. And it does not entitle plaintiff, a local law enforcement official, to have a federal court referee his disagreement with appropriate federal immigration policy and second guess the Secretary's enforcement priorities.

The Constitution requires that a plaintiff establish standing by demonstrating a concrete and particularized injury in fact that is fairly traceable to the challenged governmental action, and that is redressable by a favorable judicial decision. The district court correctly held that plaintiff has not satisfied any of these constitutionally mandated requirements for standing.

First, plaintiff has not identified a specific and concrete injury. He claims that allowing criminal aliens to remain within Maricopa County will burden local law enforcement resources. But that is no more than a generalized contention that the presence of undocumented aliens burdens the public at large. It is not based on a personal and particularized injury necessary to support standing.

Second, such putative injuries cannot be fairly traced to the challenged deferred action guidelines. The Secretary's guidelines focus the government's resources on, *inter alia*, removing aliens who have recently entered the country, committed crimes, or pose a threat to public safety or national security. They thus concentrate removal

3

efforts on the aliens most likely to be in contact with plaintiff's law enforcement officers. The deferred action guidelines have no logical connection to plaintiff's claimed, law enforcement injury. Indeed, the district court correctly reasoned that invalidating the deferred action policies may exacerbate rather than alleviate plaintiff's law enforcement concerns by impairing the government's ability to remove aliens disposed to commit crimes, and by preventing the government from dedicating additional resources to enhanced border security.

Finally, invalidating the guidelines cannot redress the claimed harm. Such relief would not prevent the entry of additional aliens into the country, nor would it improve the government's ability to remove aliens engaged or disposed to engage in criminal activity. The district court therefore correctly concluded that plaintiff lacks standing to maintain this suit.

Even assuming jurisdiction, plaintiff has not satisfied the stringent standards for issuing a preliminary injunction. The district court, though noting that it is unnecessary to reach the matter in light of plaintiff's lack of standing, correctly reasoned that plaintiff's claims would fail on the merits because deferred action is consistent with statutory authority and an appropriate exercise of the Secretary's prosecutorial discretion. It concluded that the deferred action guidelines leave officials discretion to consider removal on a case-by-case basis, and that these discretionary determinations are not amenable to judicial review.

Moreover, the balance of harms and public interest weigh heavily against an injunction. The district court recognized that plaintiff cannot identify any cognizable injury. The governmental and public interests, by contrast, would be harmed by an injunction that prevents DHS from prioritizing removal of aliens who have recently crossed the border, committed crimes, or threaten national security or public safety.

## STATEMENT OF JURISDICTION

1. Plaintiff alleges jurisdiction under 28 U.S.C. § 1331. Joint Appendix ("JA.") 10. The district court held, however, that plaintiff lacks standing under Article III. The district court therefore correctly dismissed the case for lack of subject matter jurisdiction.

2. On December 23, 2014, the district court entered a final judgment denying plaintiff's motion for a preliminary injunction and dismissing the case for lack of subject matter jurisdiction. Clerk's Notation of Record ("CR.") 24. Plaintiff filed a timely notice of appeal to this Court on the same day. CR. 25. The Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether a county sheriff has standing under Article III to challenge the deferred action policies of the Secretary of Homeland Security for the exercise of prosecutorial discretion in the enforcement of the immigration laws.

2. Assuming that plaintiff has standing, whether he has satisfied the equitable standards for issuance of a preliminary injunction.

## STATEMENT OF THE CASE

A.  <u>Statutory Scheme:  Immigration Enforcement and Prosecutorial Discretion</u>.

**1.**  The Immigration and Nationality Act of 1952 ("INA"), 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq.*, and related immigration laws establish a comprehensive federal statutory scheme for regulation of immigration and naturalization and set the terms and conditions of admission to the country, the subsequent treatment of aliens lawfully in the country, and the grounds and process for removal of aliens from the country.  *Chamber of Commerce of the United States* v. *Whiting*, 131 S. Ct. 1968, 1973 (2011).  Congress has vested the Secretary of Homeland Security with broad authority to administer and enforce federal immigration law, (*see* 8 U.S.C. §§ 1103(a)(1),(3)) and has directed the Secretary to "[e]stablish[] national immigration enforcement policies and priorities." 6 U.S.C. § 202(5).

The INA sets forth a range of grounds on which an alien may be removed from the United States.  *See, e.g.,* 8 U.S.C. §§ 1227(a), 1182(a).  For example, aliens who have been convicted of certain crimes or who have engaged in certain criminal or terrorism-related activity that endangers public safety are removable.  8 U.S.C. § 1227(a)(2), (4); 8 U.S.C. § 1182(a)(2), (3).  Aliens also are removable if they remain in the country beyond their authorized period of stay or violate the conditions of their nonimmigrant status.  8 U.S.C. §§ 1227(a)(1)(B), (C).  Aliens are inadmissible and may be removed if they lacked an appropriate visa or entry document (*see* 8 U.S.C. §

1182(a)(6), (7)) or were inadmissible at the time of their entry into the United States

(*see* 8 U.S.C. § 1227(a)(1)(A), (C)).

**2.**   Immigration officers have broad prosecutorial discretion to refrain from

taking enforcement action against aliens who are removable from the United States.

In *Reno* v. *American Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84 (1999), the

Supreme Court explained that "[a]t each stage [of the deportation process] the

Executive has discretion to abandon the endeavor."  The Court specifically

recognized that immigration officials "had been engaging in a regular practice (which

has come to be known as 'deferred action') of exercising that discretion for

humanitarian reasons or simply for its own convenience."  *Ibid.*  The Supreme Court

recently confirmed that "[a] principal feature of the removal system is the broad

discretion exercised by immigration officials." *Arizona* v. *United States*, 132 S. Ct. 2492,

2499 (2012).  It recognized that the exercise of enforcement discretion may turn on

"whether the alien has children born in the United States, long ties to the community,

or a record of distinguished military service" or may instead involve policy choices

that bear on the nation's foreign relations.  *Ibid.*  The Court stated that "Federal

officials, as an initial matter, must decide whether it makes sense to pursue removal at

all."  *Ibid.*

Deferred action constitutes an exercise of administrative discretion in which

immigration officials temporarily defer removal proceedings.  *USCIS, Standard*

*Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices* at 3 (2012).

A grant of deferred action "does not confer any immigration status"— *i.e.*, it does not establish any enforceable legal right to remain in the United States and it can be revoked by immigration authorities at their discretion. *Id.* at 3, 7. Until and unless it is revoked, however, it represents DHS's decision not to seek the alien's removal for a specified time.

This enforcement discretion is essential to DHS's mission. Congress has appropriated resources for DHS that are sufficient to pursue only a small fraction of the violations it confronts. In particular, recent funding provided to DHS's U.S. Immigration and Customs Enforcement, the component of DHS charged with enforcing immigration laws in the interior of the country, has allowed the agency to annually remove only a few hundred thousand of the estimated 11.3 million undocumented aliens living in the United States and the many others newly apprehended at the border. *See* Office of Legal Counsel, *DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* at 9 (Nov. 19, 2014) *reprinted in* JA. 290. DHS accordingly must decide where to focus (and where not to focus) its limited resources. In light of these resource constraints, Congress has directed DHS to prioritize "the identification and removal of aliens convicted of a crime by the severity of the crime"[1] and to ensure "that the government's huge investments in immigration enforcement are producing the

---

[1] DHS Appropriations Act 2010, Pub. L. No. 111-83, 123 Stat. 2142, 2149 (2009); Consolidated Appropriations Act of 2014, Pub. L. No. 113-76, div. F., Tit. II, 128 Stat. 5, 251 (2014).

maximum return in actually making our country safer." H.R. Rep. No. 111-157, 111th Cong., 1st Sess. 8 (2009).

**3.**  The exercise of enforcement discretion in determining whether to seek removal of an alien is a longstanding agency practice. In a 1976 legal opinion, the General Counsel of the Immigration and Naturalization Service (the predecessor agency to DHS regarding immigration matters) concluded that there was, at that time, already an established administrative practice of exercising prosecutorial discretion in the enforcement of the immigration laws. *See* JA. 450-56. The opinion noted that "[t]here simply are not enough resources to enforce all of the rules and regulations presently on the books," and that law enforcement officials consequently "have to make policy choices as to the most effective and desirable way in which to deploy their limited resources." JA. 450. The opinion concluded that that such discretion is inherent in the agency enforcement function, and that administrative and judicial precedents had consistently affirmed the agency's authority to determine whether and when to remove an alien from the country. JA. 453-55.

There is accordingly a long history of instances in which the Executive Branch has exercised its prosecutorial discretion to refrain from removing certain aliens from the United States. Dating back to at least 1956, the Executive Branch has made various forms of broad-based, discretionary relief from removal available to particular aliens, taking into account available enforcement resources, humanitarian considerations, and foreign relations. This includes affording temporary discretionary

relief from removal to: (1) nationals of designated foreign states; (2) spouses and children of aliens who had been granted lawful immigration status under the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359; (3) certain aliens who, though not holding the pertinent visa at the time of entry, were physically present within the United States and were the subsequent beneficiaries of an approved "Third Preference" visa petition for Eastern Hemisphere natives; and (4) nurses who were eligible for, but had not yet received, H-1 visas.  JA. 295-97.

Since 1990, the Executive Branch, on a case-by-case basis, specifically has made the discretionary grant of "deferred action" available to aliens within various groups, including:  certain victims of domestic violence petitioning for visas under the Violence Against Women Act of 1994 Pub. L. No. 103-322, 108 Stat. 1796, 1902; applicants for "T" and "U" visas made available to the victims of human trafficking and certain other crimes under the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464; foreign students who, as a result of Hurricane Katrina, became temporarily unable to pursue the full course of study necessary to maintain their "F-1" student visas; and widows and widowers of U.S. citizens who, upon the death of their citizen spouse, lost their basis for obtaining an immigrant visa because the death occurred less than two years after the marriage.  JA. 296-98.

Congress has enacted statutes that expressly recognize the Executive Branch's prosecutorial discretion to grant deferred action.  In 2000, Congress expanded DHS's

policy of deferring action against applicants for visas authorized by the Violence

Against Women Act by enacting specific statutory provisions providing "deferred

action and work authorization" for certain children who could no longer petition for

visas under that statute.  8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV).  In addition, in the

REAL ID Act of 2005, Congress provided that States may (but are not required to)

issue drivers licenses that will be acceptable identification for certain federal purposes

to aliens who produce documentary evidence of "approved deferred action status."

Pub. L. No. 109-13, div. B, § 202(c)(2)(B)(viii), 119 Stat. 231, 302, 49 U.S.C. § 30301

note.  Congress has also expressly provided that certain other aliens not otherwise

authorized to remain within the United States may be accorded deferred action.  It has

thus, by statute, specifically recognized the agency's authority to accord "deferred

action" to certain alien family members of lawful permanent residents killed in the

terrorist attacks on September 11, 2001 (*USA PATRIOT Act of 2001*, Pub. L. No.

107-56, § 423(b), 115 Stat. 272, 361), and to certain alien family members of U.S.

citizens killed in combat (*Nat'l Defense Authorization Act for Fiscal Year 2004*, Pub. L.

No. 108-136, § 1703(c)-(d), 117 Stat. 1392, 1694).

It is a longstanding and necessary corollary of granting aliens deferred action

that, during that time, such recipient aliens are able to seek authorization to work

legally in the United States. Otherwise, aliens granted deferred action would be left to

work illegally, or to rely on support from family members, friends or charities.

Congress has expressly granted the Secretary statutory authority to determine whether

to authorize an alien to work in the United States. *See* 8 U.S.C. § 1324a(h)(3) (defining "unauthorized alien" not entitled to work as an alien who is neither a legal permanent resident nor "authorized to be . . . employed by [the INA] or by the Attorney General").[2] Longstanding regulations accordingly provide for the grant of work authorization to aliens who have been granted deferred action – which the regulations describe as "an act of administrative convenience to the government which gives some cases lower priority" – if the alien establishes an economic necessity for employment. 8 C.F.R. § 274a.12(c)(14).

    B.  <u>Deferred Action for Childhood Arrivals and for Parents of U.S. Citizens and of Lawful Permanent Residents</u>.

    **1.**  On June 15, 2012, the Secretary of Homeland Security issued a memorandum addressing the exercise of prosecutorial discretion in the enforcement of immigration laws against "young people who were brought to this country as children and know only this country as a home." JA. 101. The Secretary determined that "additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities." *Id.* The Secretary further explained:

> Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor

---

[2] The Attorney General's discretionary authority to authorize employment has been transferred to the Secretary of Homeland Security. *See* 6 U.S.C. §§ 271(b) 275, 552(d) & 557.

are they designed to remove productive young people to countries where
they may not have lived or even speak the language. Indeed, many of
these young people have already contributed to our country in significant
ways. Prosecutorial discretion, which is used in so many other areas, is
especially justified here.

JA. 102.

That 2012 memorandum outlines a discretionary enforcement policy referred

to as Deferred Action for Childhood Arrivals or "DACA." It provides that

immigration officials, on a case-by-case basis, may consider refraining from

prosecuting removal actions against aliens who: (1) were under the age of sixteen

when they came to the United States; (2) were present in the United States on the

June 2012 effective date of the memorandum and continuously resided in the U.S. for

at least five years preceding the effective date of the memorandum; (3) are in school,

have completed high school level education, have obtained a GED certificate, or have

been honorably discharged from the Coast Guard or other U.S. armed service; (4)

have not been convicted of significant criminal offenses and do not otherwise pose a

threat to public safety or national security; and (5) are under age 31. JA. 101.

Aliens who meet these guidelines and pass a background check may, at the

Secretary's discretion and on a case-by-case basis, have enforcement action against

them deferred at various points in the immigration removal process. First, with

respect to aliens encountered by immigration officials but not currently in removal

proceedings, officials should exercise their discretion, on an individual basis, to defer

enforcement action for a two-year period, subject to renewal, so that resources are not

13

dedicated to commencing removal proceedings against aliens who are not enforcement priorities.  JA. 102.

Second, for aliens in removal proceedings, immigration officials should consider deferring further enforcement action for two years, subject to renewal, to avoid further expenditure of resources on taking enforcement action against individuals who are not a priority for removal from the United States. *Ibid.*

Third, the Secretary's 2012 memorandum provides for establishment of an administrative process through which aliens can request deferred action, even if they are not in removal proceedings or otherwise subject to active scrutiny of their immigration status.  JA. 102-03.

As noted, if deferred action is granted, the alien may be authorized to work legally during the period for which deferred action has been granted, pursuant to a regulation in effect since the 1980's.  JA. 103; *see* 8 C.F.R. 274a.12(c)(14).

The Secretary's 2012 memorandum explicitly states that it "confers no substantive right, immigration status or pathway to citizenship" and is intended "to set forth policy for the exercise of discretion within the framework of existing law." JA. 103.  The agency thus retains discretion to institute or re-institute enforcement action at any time, for any reason whatsoever.

**2.**  On November 20, 2014, the Secretary issued new polices for apprehending, detaining, and removing from the country aliens who pose a threat to national security, public safety, or border security.  JA. 155.  The pertinent memorandum was

issued on the same day as a separate memorandum revising the Secretary's deferred action guidelines. It notes that the government lacks sufficient resources to investigate and prosecute every immigration violation. The Secretary accordingly directed that first priority be accorded to removing aliens who have engaged in, or who are suspected of engaging in, terrorism, espionage, or other acts threatening national security; aliens who are attempting to enter or have recently crossed the border in violation of the law; aliens convicted of crimes involving gang activity; aliens convicted of certain felonies; and aliens convicted of offenses that are classified as "aggravated felonies" under the INA. JA. 155.

The Secretary further directed that second priority for removal be accorded to aliens who have been convicted of three or more misdemeanor offenses unrelated to minor traffic violations or immigration violations; significant misdemeanors involving domestic violence, drug trafficking, unlawful possession of a firearm, other serious misconduct; or offenses for which a court has imposed a sentence of at least 90 days' incarceration. JA. 156-57. Second priority is also accorded to removing aliens who unlawfully entered the United States after January 1, 2014, and aliens who have significantly abused their visas or the visa waiver program. *Ibid.*

Finally, the Secretary directed that third priority be accorded to aliens who are not described in Priority 1 or 2 and who have been issued a final order of removal on or after January 1, 2014. JA. 157.

The Secretary explained that other unlawfully present aliens remain subject to removal.  He stressed, however, that resources should, to the greatest extent possible, be focused on those aliens who fall within these three enforcement priorities.  JA. 158.

**3.**  In conjunction with this effort to focus resources on aliens who are priorities for removal, and as part of that effort, the Secretary issued a memorandum on the same date revising several aspects of the 2012 DACA policy.  The revised guidelines remove the upper age cap, so that individuals may request deferred action under DACA regardless of their current age, as long as they entered the United States before the age of 16.   The revisions extend the period of deferred action from two to three years.  And they adjust the relevant date by which an individual must have been in the United States from June 15, 2007 to January 1, 2010.  JA. 147-48.

The Secretary also announced guidelines for deferring enforcement action with respect to certain aliens who are parents of U.S. citizens or of lawful permanent residents, referred to as "DAPA."  To be considered for deferred action on this basis, an individual must: (1) have, as of November 20, 2014, a son or daughter who is a U.S. citizen or is a lawful permanent resident; (2) have continuously resided in the United States since before January 1, 2010; (3) have been physically present in the United States on November 20, 2014, and at the time of making a request for deferred action; (4) have had no lawful immigration status on November 20, 2014; (5) not fall within one of the enforcement priorities established by the Secretary; and

16

(6) present no other factors that, in the exercise of discretion, make the grant of deferred action inappropriate. JA. 148.

As with DACA, a determination to defer enforcement action under DAPA is made on a case-by-case basis. The alien must pass a background check and be individually assessed in light of the Secretary's enforcement guidelines. JA. 148. If appropriate, enforcement action will be deferred generally for a three-year period, subject to renewal. JA. 149. Aliens granted deferred action may also be authorized to work, provided they meet the statutory and regulatory requirements for work authorization (*see* 8 U.S.C. § 1324a(h)(3); 8 C.F.R. § 274a.12(c)(14)) and pay a fee covering the cost of processing their application. JA. 148-49.

The Secretary's guidelines for deferring enforcement action against the parents of U.S. citizens or lawful permanent residents do not establish any substantive entitlement to deferred action. JA. 149. Nor do they confer lawful immigrant status or pathway to citizenship. *Ibid.* Rather, aliens who meet the guidelines may be denied deferred action if other case-specific factors (such as an arrest without conviction or involvement in gang activity) indicate that removal is appropriate. JA. 148, 149. And as under DACA, deferred action that is granted to such parents can be revoked whenever the agency determines that enforcement action is warranted.

C. <u>District Court Proceedings</u>

**1.** Plaintiff is the sheriff of Maricopa County, Arizona. He alleges, among other claims, that the deferred action policies of the Secretary of Homeland Security

17

violate federal immigration laws and the President's duty under Article II, section 3 of the Constitution to "take Care that the Laws be faithfully executed." JA. 18-20. Plaintiff further asserts that he is "adversely affected and harmed in his office's finances, workload, and interference with the conduct of his duties, by the failure of the executive branch to enforce existing immigration laws." JA. 15.

Plaintiff sought a preliminary injunction directing the President and subordinate officials to "cease and desist and not initiate the plans for" implementing the challenged immigration policies. JA. 99. The government explained that the plaintiff lacked standing to challenge federal immigration policies and opposed plaintiff's motion, arguing that plaintiff had not demonstrated a likelihood of success on the merits or shown that the balance of harms and public interest warranted preliminary relief. The district court treated the government's standing arguments as a motion to dismiss and afforded plaintiff an opportunity to file a reply brief and a supplemental declaration supporting his standing to bring suit. JA. 774, 654-62.

**2.** The district court denied plaintiff's motion for a preliminary injunction and dismissed the case for lack of subject matter jurisdiction. The court noted that Article III standing doctrine requires plaintiff to demonstrate that he has suffered (1) a concrete and particularized injury in fact that is (2) fairly traceable to the challenged action of the defendant and (3) redressable by a favorable decision from the court. JA. 779-80. The court held that plaintiff had not satisfied any of these three constitutional requirements and therefore lacked standing to sue.

18

As an initial matter, the court held that plaintiff had not demonstrated a cognizable injury from the challenged deferred action policies. JA. 780. It reasoned that insofar as plaintiff had brought the suit in his personal capacity, the law is well settled that "'private persons have no judicially cognizable interest in procuring enforcement of the immigration laws.'" JA. 781, quoting *Sure-Tan, Inc.* v. *NLRB*, 467 U.S. 883, 897 (1984). Plaintiff's claims as a private individual thus amounted to no more than a generalized grievance as to the proper application of the Constitution and immigration laws – an interest that is not constitutionally sufficient to support Article III standing. JA. 781.

The court further reasoned that insofar as plaintiff brought suit in his official capacity, he had not shown that the challenged policies interfere with his duties as sheriff of Maricopa County. The court noted that the challenged guidelines do not regulate plaintiff in the conduct of his office but are rather confined to enforcement of federal immigration laws – a matter that lies outside plaintiff's authority as a local law enforcement official. JA. 783-84. It concluded that "a state official has not suffered an injury in fact to a legally cognizable interest because a federal government program is anticipated to produce an increase in that state's population and concomitant increase in the need for the state's resources." JA. 785.

The court found, in addition, that plaintiff had not demonstrated that his claimed injuries are fairly traceable to the deferred action policies. The court stressed that plaintiff's alleged injuries are due to the independent action of third parties –

19

aliens who plaintiff alleged will enter the country and commit crimes in Maricopa County in response to the challenged deferred action policies. JA. 785-86. The court explained that the challenged policies, which by their terms are restricted to persons already present in this country, do not authorize new immigration, much less criminal activity. JA. 788. Moreover, the court pointed out that the deferred action policies focus the government's enforcement resources on removing criminal aliens and promoting border security and thus may well reduce rather than exacerbate any adverse consequences that flow from alien criminal activity within plaintiff's county. JA. 788.

The court concluded that plaintiff's claimed injuries could not be redressed by a favorable decision. The court explained that an order barring implementation of the deferred action policies would not prevent aliens from attempting to unlawfully enter the United States, would not prevent any subsequent criminal activity that could burden law enforcement resources, would not provide the Executive Branch the additional resources needed to prevent more undocumented aliens from entering the United States, and would not increase the government's ability to remove criminal aliens who had previously entered the United States. JA. 792-93.

Finally, the court stated that even if the plaintiff could establish standing, he could not satisfy any of the standards governing issuance of a preliminary injunction. The court found that "the deferred action programs are consistent with, rather than contrary to, congressional policy" (JA. 795), that the guidelines are not binding rules

but instead afford officials discretion to consider deferred action on a case-by-case basis (JA. 796), and that the policies are a faithful execution of the immigration laws (JA. 796). It also found that the balance of harms and public interest did not warrant an injunction, noting that plaintiff had not established irreparable harm (JA. 797), and that the government and public interest would be harmed by impairing the Secretary's ability to concentrate limited resources on removing aliens who have committed crimes or pose a threat to national security or public safety (*id.*).

## SUMMARY OF ARGUMENT

**1.** Immigration is a uniquely national concern. The Constitution accordingly vests exclusive responsibility over immigration policies, including the enforcement of immigration laws, with the federal government. In this case, a local sheriff has brought suit in an effort to assert control over nationwide federal immigration enforcement policies with which he disagrees. The district court correctly held that plaintiff lacks standing to pursue this dispute in federal court.

Plaintiff has not demonstrated a concrete and particularized injury in fact, fairly traceable to the Secretary's deferred action policies, or redressable by a favorable judicial decision. The challenged policies do not apply to plaintiff or in any way constrain his conduct as sheriff of Maricopa County and thus cannot injure him directly. Plaintiff maintains that he is nonetheless indirectly injured by the Secretary's exercise of prosecutorial discretion because deferred enforcement action will increase the number of aliens committing crimes within his jurisdiction, thereby burdening his

21

law enforcement resources. This assertion is entirely speculative. Indeed, the Secretary's policies are crafted to concentrate the government's limited enforcement resources on removing aliens who are most likely to commit crimes, and on improving the government's ability to prevent unauthorized aliens from entering the country in the first instance. These policies have no logical nexus to plaintiff's claimed injuries, and invalidating them would be more likely to exacerbate rather than redress plaintiff's alleged harm. Plaintiff therefore lacks standing.

    **2.** Even if plaintiff has standing, the district court correctly concluded that he has not satisfied the standards for obtaining a preliminary injunction. As an initial matter, plaintiff is not likely to prevail on the merits. Review of the Secretary's exercise of enforcement discretion is not available under the APA. The district court recognized that the Secretary's prosecutorial discretion is conferred by statute, and exercising that discretion through deferred action is a longstanding practice that has been endorsed by Congress. JA. 795. Moreover, an agency's announcement of the criteria guiding the determination of whether to exercise a discretionary enforcement power is a general statement of policy not subject to the notice-and-comment rulemaking requirements of the Administrative Procedure Act. Plaintiff is thus unlikely to succeed on any of his procedural and substantive claims.

    Moreover, the balance of harms and public interest further show that a preliminary injunction is not warranted. Plaintiff has not established any cognizable injury and thus cannot demonstrate irreparable harm warranting issuance of a

preliminary injunction.  On the other side of the balance, the governmental and public

interest in effective policies for allocating the government's enforcement resources

weighs heavily against enjoining guidelines that focus removal efforts on protecting

the border, public safety, and national security.  The district court therefore correctly

determined that plaintiff had not carried his burden of establishing that the

requirements for a preliminary injunction have been met.

## STANDARD OF REVIEW

The district court's dismissal of the case for lack of standing presents a

question of law subject to this Court's *de novo* review.  *In re Endangered Species Act Section

4 Deadline Litigation*, 704 F.3d 972, 976 (D.C. Cir. 2013).  Denial of a preliminary

injunction is reviewed for abuse of discretion.  *Sherley* v. *Sebelius*, 644 F.3d 388, 393

(D.C. Cir. 2011).

## ARGUMENT

### I.  Plaintiff Lacks Standing To Challenge The Secretary's Deferred Action Policies For The Exercise of Prosecutorial Discretion In The Enforcement Of Federal Immigration Law.

The deferred action policies challenged here reflect the Secretary's considered

judgment of how best to employ the limited enforcement resources made available by

Congress while fully discharging his enforcement responsibilities under the

immigration laws.  The Executive Branch lacks sufficient law enforcement personnel,

detention facilities, and adjudicatory resources to seek removal of every alien who is

not lawfully present or otherwise removable.  The Secretary has accordingly

23

concluded that the government's finite resources must be focused first on maintaining border security, and on prosecuting removal actions against aliens who pose a threat to national security or public safety. To facilitate the necessary targeting of these limited resources, the Secretary, consistent with decades of administrative practice, has established the policies of deferring enforcement action, on a discretionary and revocable basis, against certain aliens who have substantial and longstanding ties to the United States, no disqualifying criminal convictions, and no other factor in their individual circumstances indicating that their continued presence poses a threat to national security or public safety.

The district court correctly concluded that plaintiff's conclusory and speculative assertions of generalized injury are insufficient to establish plaintiff's standing to challenge these deferred action policies. To establish standing, a plaintiff must show that he has suffered "some actual or threatened injury" fairly traceable to the challenged conduct of the defendants that is likely to be redressed by a favorable decision. *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982). An abstract, general disagreement with the manner in which the government is administering and interpreting immigration laws cannot satisfy these requirements. "[A]n injury amounting only to the alleged violation of a right to have the Government act in accordance with law [is] not judicially cognizable." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 575 (1992). The Supreme Court thus has "repeatedly held that an asserted right to have the

24

Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen* v. *Wright*, 468 U.S. 737, 754 (1984). The plaintiff must instead allege a concrete and particularized injury. Yet plaintiff has presented only a generalized grievance about the wisdom of the federal government's current immigration policy, a grievance wholly divorced from the concrete and particularized injury necessary to support standing. Even as claimed, such an alleged injury would neither be traceable to the challenged policies nor redressable by an injunction against them. The district court therefore correctly dismissed plaintiff's suit for lack of jurisdiction.

    A.   <u>Plaintiff Did Not Allege a Concrete and Particularized Injury In Fact</u>.

    1. Plaintiff has failed to set forth a plausible claim of cognizable injury stemming from the Secretary's deferred action policies. At the outset, as the district court noted (JA. 781), a plaintiff "lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S.* v. *Richard D.*, 410 U.S. 614, 619 (1973). Thus, "private persons . . . have no judicially cognizable interest in procuring enforcement of the immigration laws by the INS [now DHS]." *Sure-Tan, Inc.* v. *NLRB,* 467 U.S. at 897.

    Moreover, the enforcement policies that plaintiff is seeking to challenge do not regulate plaintiff in the performance of his official duties as sheriff of Maricopa County. They do not require plaintiff to take or refrain from taking any action. And

they do not impose any direct financial obligation on plaintiff or his office. They deal solely with the means by which federal immigration officers carry out their responsibilities under federal immigration law. They thus cannot injure plaintiff in any direct and immediate way. *Cf. Fraternal Order of Police* v. *United States,* 152 F.3d 998, 1001-1002 (D.C. Cir. 1998) (finding standing where federal law interfered with local law enforcement officer's internal personnel decisions).

Plaintiff nonetheless alleges that he has already been "harmed in his office's finances, workload, and interference with the conduct of his duties" by the Secretary's alleged failure to enforce existing immigration laws, JA. 15, and speculates that he will be harmed in the future by an influx of new, unauthorized migrants who will then commit crimes within his jurisdiction and further burden his law enforcement resources. JA. 15, 162, 656. He thus alleges, not a direct injury from federal policies, but an indirect, consequential injury from the policies' alleged impact on individual private conduct, which in turn could have an alleged impact on county law enforcement resources.

These allegations of present and future injury are not constitutionally sufficient to establish standing. The essence of plaintiff's claim of present and future injury is that the presence of undocumented aliens results in criminal activity, thereby causing damage to the interests of residents and local law enforcement "in Maricopa County, throughout Arizona, and across the border region." JA. 657. The district court correctly recognized that these allegations do not state a concrete and particularized

26

injury to plaintiff.  JA. 784.  Instead, plaintiff merely presses a generalized complaint that, in his view, national immigration policies are misguided and will increase widely-shared societal and governmental costs.  But "'a generalized grievance' shared in substantially equal measure by all or a large class of citizens" will not ordinarily support standing.[3]  *Warth* v. *Seldin*, 422 U.S. 490, 500 (1975).

The courts have consistently rejected attempts to invoke federal court jurisdiction over allegations, like those pressed by plaintiff here, that federal immigration policy imposes general costs on the public at large.  *See Fed'n. for Am. Immigration Reform* v. *Reno*, 93 F.3d 897, 901 (D.C. Cir. 1997) ("The injury (if any) to a citizen qua citizen from admission of an alien is an injury common to the entire population, and for that reason seems particularly well-suited for redress in the political rather than the judicial sphere"); *New Jersey* v. *United States*, 91 F.3d 463, 470 (3d Cir. 1996); ("Decisions about how best to enforce the nation's immigration laws . . . patently involve policy judgments about resource allocation and enforcement methods . . . fall[ing] squarely within a substantive area clearly committed by the Constitution to the political branches"); *Padavan* v. *United States*, 82 F.3d 23, 26-27  (2d Cir. 1996) (claim that federal immigration policy imposes on States unreimbursed incarceration, education, and health and welfare costs does not present a justiciable

---

[3] The lack of jurisdiction over "generalized grievances" has sometimes been characterized as a matter of prudential rather than constitutional standing.  Recent case law, however, indicates that claims amounting to no more than a "generalized grievance" do not meet the case or controversy requirements of Article III.  *See Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.3 (2014).

controversy); *Texas* v. *United States*, 106 F.3d 661, 665-67 (5th Cir. 1997) (same); *California* v. *United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (same); *Crane* v. *Napolitano*, 920 F. Supp. 2d 724, 745-46 (N.D. Tex. 2013) (Mississippi lacks standing to challenge the 2012 DACA Guidance), *appeal pending*, No. 14-10049 (5th Cir.) (argued Feb. 3, 2015).[4]

Central to the concept of "particularized" injury is the requirement that a plaintiff be affected in a "personal and individual way," *Lujan*, 504 U.S. at 560 n.1, and seek relief that "directly and tangibly benefits him" in a manner distinct from its impact on "the public at large," *id.* at 573-74. The complaint must establish that the plaintiff has a "personal stake" in the dispute and that the alleged injury is particularized as to him. *Raines* v. *Byrd*, 521 U.S. 811, 819 (1997). But like the claim found non-justiciable in *Lujan*, plaintiff's complaint is a "generally available grievance about government -- claiming only harm to his and every citizen's interest in [the] proper application of the Constitution and laws . . . ." *Lujan*, 504 U.S. at 573. It does not present an Article III case or controversy within the Court's jurisdiction.

Plaintiff's additional claim of a *future* injury stemming from a projected increase in unlawful migration also fails to state a cognizable injury in fact. This claim is based

---

[4] In *Texas* v. *United States*, No. 15-254 (S.D. Tex. Feb. 16, 2015), *appeal pending*, No. 15-40238 (5th Cir.), the district court held that Texas has standing to challenge some of the deferred action guidelines, reasoning that the federal government "has required and will require states to take certain actions regarding DAPA recipients." Op. at 65. That is factually incorrect. Moreover, this reasoning cannot, in any event, support plaintiff's standing here because the deferred action guidelines plainly do not require local law enforcement officials to take or refrain from taking any action.

on speculation and conjecture about future migration and future criminal activity and is therefore insufficient to support standing, as the district court concluded. "Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be *certainly impending* to constitute injury in fact." *Whitemore* v. *Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added, internal quotations omitted); *accord Clapper* v. *Amnesty Int'l USA*, 133 S. Ct. 1138, 1148 (2013). Here, plaintiff's allegation of future injury depends on a chain of speculation and conjecture about third-party conduct.

In particular, plaintiff's theory of future injury assumes that, notwithstanding the complexity of social and economic factors bearing on a decision whether to migrate, aliens will be drawn into the United States by the prospect of obtaining deferred action under the challenged policies – even though the deferred action policies do not apply to aliens who enter the country after January 1, 2010, and even though the policies include increased efforts to prevent in the first instance unauthorized entry into the United States. Plaintiff's theory of future injury further assumes that, once present, the hypothesized wave of undocumented aliens will commit crimes in significant numbers, thereby burdening local law enforcement resources, and specifically his particular jurisdiction.

The district court rightly declined to accept such speculation. The courts have consistently rejected efforts to base standing on similar speculation about the potential harm caused by the future conduct of third parties, especially where the claimed injury

29

rests on unsubstantiated predictions of future unlawful activity. *See, e.g., City of Los Angeles* v. *Lyons*, 461 U.S. 95, 102 (1983) ("'past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects'") (quoting *O'Shea* v. *Littleton*, 414 U.S. 488, 495-96 (1974)).

These same considerations compel rejection of plaintiff's claim of future injury here. The district court explained that "the decision for any individual to migrate is a complex decision with multiple factors, including factors entirely outside the United States' control, such as social, economic, and political strife in a foreign country." JA. 785. Moreover, the deferred action guidelines are unlikely to induce such migration because they apply only to aliens residing in the United States prior to January 1, 2010. JA. 785. Plaintiff's notion that deferred action will nonetheless attract a wave of undocumented migrants, and that these aliens will in turn engage in criminal activity, is entirely speculative. His complaint, at most, states a hypothetical possibility of future injury. Plaintiff's claim thus does not remotely approach the constitutional requirement that a future injury be "certainly impending." *Clapper* 133 S. Ct. at 1148.

2. Plaintiff does not dispute the foregoing legal principles. Instead, he argues that the district court committed a procedural error by failing to assume that his allegations of injury were true when ruling on a motion to dismiss for lack of jurisdiction. Appellant Br. at 35-37. That argument mischaracterizes the district court's holding and misstates the applicable law.

30

The district court did not find that plaintiff's allegations of present injury were untrue. To the contrary, the court expressly acknowledged that "[w]hen considering a motion to dismiss under Rule 12(b)(1), the court must accept as true all uncontroverted material factual allegations in the complaint . . . ." JA. 777. Applying that standard, the court construed the complaint as asserting that "[a] Federal policy causes [plaintiff's] office to expend resources in a manner that he deems suboptimal." JA. 784.

The district court instead ruled that plaintiff's allegations were insufficient on their face because they stated only a generalized grievance. JA. 784. The court thus concluded that "a state official has not suffered an injury in fact to a legally cognizable interest because a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources." JA. 785. Such claims, the court held, are insufficient *as a matter of law* because they raise "only a generally available grievance about government" and claim an injury that is indistinguishable from putative harm to the public at large. JA. 784.

Plaintiff also errs in characterizing his claims of future injury as allegations of "fact" that the district court was obligated to take as true. This Court has recognized that an allegation of future injury is a prediction, not a fact, and the reviewing court is not required to accept it as true if unduly speculative:

> When considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) and

31

> those which predict a future injury that will result from present or on-going actions – those types of allegations that are not normally susceptible of labeling as "true" or "false."

*United Transportation Union* v. *ICC*, 891 F.2d 908, 911-12 (D.C. Cir. 1989) (internal quotations and citations omitted); *see also Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007) (complaint that is nothing "more than labels and conclusions . . . will not do.").

Finally, plaintiff's attempted reliance on *Natural Resources Defense Council* v. *EPA*, 643 F.3d 311 (D.C. Cir. 2011) and *Natural Resources Defense Council* v. *EPA*, 755 F.3d 1010 (D.C. Cir. 2014) is misplaced.  He argues that these precedents support standing on the basis of a claimed future injury.  *See* Appellant Br. at 47-48.  But the point is not that future injury can never support standing.  It is that the claimed future injury must be "certainly impending," *Clapper* 133 S. Ct. at 1148, rather than conjectural – a standard that was met in the above-cited precedents but that plaintiff cannot meet here.

### B. <u>Plaintiff's Claimed Injury Is Not Fairly Traceable To The Secretary's Deferred Action Policies</u>.

When a plaintiff's asserted injury arises from actions of third parties not before the court, it becomes "'substantially more difficult'" to establish standing, because the necessary elements of causation and redressability hinge on their independent choices. *Nat'l Wrestling Coaches Ass'n* v. *Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (quoting *Lujan*, 504 U.S. at 562).  Here, plaintiff claims that aliens will commit crimes within his county, thereby burdening his law enforcement resources.  To satisfy the

causation element of standing, he must thus show that the challenged deferred action policies are causally connected to the putative injury caused by alien third parties.

The district court correctly held (JA. 788-89) that plaintiff failed to demonstrate any causal link between the Secretary's policies and his claimed injuries. With respect to aliens already present in the United States, the policies make clear that individuals who have committed serious crimes are priorities for removal. These policies contemplate deferring enforcement action only against aliens who have no significant criminal record, and they apply only to aliens who, by virtue of their long-term ties to the United States, education, and/or military service, are apt to be well assimilated and readily employable. Nothing in these circumstances suggests that, as a group, candidates for deferred action are disposed to commit crimes burdening plaintiff's law enforcement resources. Indeed, the Secretary's latest deferred action guidelines were issued in conjunction with additional guidelines clarifying that the Secretary's enforcement resources will be focused on removing from the country aliens who commit serious crimes. *See* JA. 155-56.

Plaintiff's assertion that the policies will, in the future, draw in new arrivals intent on committing crimes is similarly untenable. As the district court noted (JA. 785, 781), the decision to migrate to the United States is the product of a complex set of social and economic factors in the country of origin, including civic instability, high rates of violent crime, poverty, and other threats to health and safety. *See, e.g.,* Congressional Research Service, *Unaccompanied Alien Children: Potential Factors*

33

*Contributing to Recent Immigration* (July 3, 2014), available at <

http://fas.org/sgp/crs/homesec/R43628.pdf>.  Plaintiff's conjecture that deferred

action policies will cause a wave of undocumented aliens is speculative, especially

given that the policy is inapplicable to aliens who enter the United States after January

1, 2010.  Any migration based on third-party misunderstandings of the limitations on

according deferred action under DACA or DAPA would not be "fairly traceable" to

defendants' actions. Moreover, a central feature of the policies is to make more

resources available for increased border security, thereby enhancing the government's

ability to prevent unlawful entry in the first instance.  These policies are more likely to

ameliorate rather than exacerbate the adverse consequences alleged by plaintiff.

Plaintiff's various challenges to the district court's holding on lack of causation

are without merit.  First, contrary to plaintiff's contentions (*see* Appellant Br. at 39-40),

the district court was not obligated to accept as true his conclusory assertions that the

alleged harm is caused by the Secretary's policies.  The assertion that a claimed injury

is "fairly traceable" to the challenged conduct is a legal conclusion, not a factual

allegation.  And on a motion to dismiss, a district court is not obligated to accept as

true a legal conclusion merely because it is couched as a factual allegation.  *Twombly*,

550 U.S. at 555; *Papasan* v. *Allain*, 478 U.S. 265, 286 (1986); *see also* Charles Alan

Wright and Arthur R. Miller, 5B *Federal Practice and Procedure*,  Civ. § 1357 (3d ed. 2004

& Supp. 2014) (noting that courts, when examining 12(b)(6) motions, have rejected

"sweeping legal conclusions cast in the form of factual allegations").

34

This principle applies with particular force when a district court dismisses a suit under Rule 12(b)(1) for lack of standing. The party invoking federal jurisdiction bears the burden of establishing each element of standing. *FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 231 (1990). Thus, where a defendant contests the factual underpinnings of a plaintiff's standing, the court is not confined to the four corners of the complaint. It may instead require the plaintiff to supply by affidavit additional evidence establishing the plaintiff's standing and resolve disputed facts bearing on the court's jurisdiction. *Haase* v. *Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987); *Coalition for Underground Expansion* v. *Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).

In accordance with this established Circuit precedent, the district court invited the plaintiff to file a supplemental declaration in support of his standing to sue. JA. 774. Plaintiff thereafter submitted a declaration containing additional factual assertions purportedly bearing on the court's jurisdiction. JA. 654-62. He thus did not rest on the allegations of his complaint but instead adduced evidentiary material intended to establish his standing. In this procedural posture, the district court was not obligated to accept as true plaintiff's bare allegation that deferred action policies cause harm to his office.

Second, plaintiff's contentions draw no support from *Mendoza* v. *Perez*, 754 F.3d 1002 (D.C. Cir. 2014), or *Washington Alliance of Technology Workers* v. *DHS*, No 14-526, 2014 WL 6537464 (D.D.C. Nov. 21, 2014). These are "competitor standing" cases holding that particular parties suffered a cognizable injury under Article III

when an agency lifted regulatory restrictions on their competitors or otherwise allowed increased competition.  Deferred action, by contrast, is an exercise of prosecutorial discretion that has no connection to regulation of parties in competition with plaintiff in the performance of his duties as county sheriff.  The district court correctly recognized that the cited cases are therefore entirely inapposite.  JA. 786-87.

Finally, plaintiff errs in asserting that the district court's holding is inconsistent with *Arizona* v. *United States*, 132 S. Ct. 2492 (2012).  There, the United States sued the State of Arizona to enjoin state laws that are preempted by federal immigration law and thus invalid under the Supremacy Clause.  Plaintiff argues that the state laws at issue in *Arizona* had an indirect effect on the federal government even though they did not directly regulate the United States, and that if standing could be based on these indirect effects there, standing may be found here as well.  Appellant Br. at 55-56.

Plaintiff's analogy to *Arizona* is meritless.  It is well established that the federal government can bring suit against a State in federal court to vindicate important federal interests.  *Seminole Tribe of Fla.* v. *Florida,* 517 U.S. 44, 71 n.14 (1996) (citing *United States* v. *Texas*, 143 U.S. 621, 644-45 (1892)).  Moreover, *Arizona* involved an effort by the federal government to vindicate its interests in maintaining the constitutional supremacy of federal immigration law and ensuring that federal law and enforcement discretion operate free of state interference -- interests that are readily distinguishable from the interests asserted by plaintiff here.  Plaintiff, as a local law

36

enforcement official, cannot claim a legally cognizable interest in freedom from the consequences of federal immigration policies.

    C.  <u>Plaintiff's Claimed Injury Is Not Judicially Redressable</u>.

    Plaintiff asserts that current law mandates removal of "100% of illegal aliens," and that if the court ordered the government to comply with this putative mandate, there would be no unlawfully present aliens in the county to cause him harm. Appellant Br. at 51.

    Plaintiff's premise -- that the law compels removal of every unlawfully present or otherwise removable alien in every circumstance -- is fundamentally incorrect. The Supreme Court has made clear that "[a]t each stage [of the deportation process] the Executive has discretion to abandon the endeavor," *Reno*, 525 U.S. at 483-84, and that "Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona*, 132 S. Ct. at 2499.

    Indeed, Congress necessarily understands that DHS must exercise its discretion not to remove many aliens. There are approximately 11.3 million undocumented aliens living in the country in addition to numerous other removable aliens apprehended at the border or in the interior. Congress, however, has appropriated sufficient funds for the agency to remove fewer than 400,000 aliens each year. JA. 290. In light of these resource constraints, Congress has made the Secretary responsible for establishing national enforcement policies and priorities. 6 U.S.C. § 202(5). And it has, in various annual appropriations laws, specifically directed DHS to

prioritize "the identification and removal of aliens convicted of a crime." *See Consolidated Appropriations Act, 2014*, Pub. L. No. 113-76, div. F., Tit. II, 128 Stat. 5, 251 (2014); *DHS Appropriations Act 2010*, Pub. L. No. 111-83, 123 Stat. 2142 (2009). The purpose of such directives, Congress has explained, is to ensure "that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer." H.R. Rep. No. 111-157, *supra* at 8 (2009).  Prosecutorial discretion to focus limited resources on enforcement priorities is thus an inherent and vital part of the Secretary's statutory authority to administer the immigration laws.

Even assuming, for purposes of evaluating plaintiff's standing, that there were a statutory mandate to remove all aliens who were unlawfully present in the United States, plaintiff has not shown that compliance with such enforcement standards could be achieved by judicial fiat.  The Secretary's guidelines for the exercise of prosecutorial discretion were in large measure instituted precisely because the government lacks sufficient personnel, detention facilities, and adjudicatory resources to enforce the immigration laws against every violator.  An order striking down the challenged deferred action guidelines would not afford the Secretary the additional resources needed to remove more aliens from the country.  JA. 792.  Nor would it bolster the Secretary's ability to prevent the unlawful entry of additional aliens.  *Ibid.*

Plaintiff suggests that any order that diminishes the number of undocumented aliens within Maricopa County would at least ameliorate the harm caused by their

presence and thus render his claim sufficiently redressable to support standing.

Appellant Br. at 52.  His underlying theory of Article III injury, however, is not that *all*

aliens cause him harm, but rather that the subset of undocumented aliens committing

crimes in his county cause him injury by burdening his law enforcement resources.

Here again, plaintiff cannot demonstrate how an order invalidating the

Secretary's deferred action guidelines would provide any degree of redress for the

claimed harm.  The Secretary's guidelines are intended to focus the government's

limited enforcement on aliens who have committed crimes, and on aliens seeking to

enter the United States without authorization.  An order enjoining the government

from concentrating its finite resources on these aliens is more likely to exacerbate any

burden on plaintiff's law enforcement resources than redress it.

> D.  Prudential Considerations Weigh Against Entertaining Plaintiff's Disagreement With Federal Immigration Policy.

In addition to the immutable requirements of Article III, the federal judiciary

has adhered to a set of prudential principles "founded in concern about the proper—

and properly limited—role of the courts in a democratic society."  *Bennett* v. *Spear*, 520

U.S. 154, 162 (1997) (quoting *Warth*, 422 U.S. at 498).  These prudential concerns

militate strongly against allowing plaintiff to use the federal courts as a forum for his

disagreement with federal immigration policy.

The Supreme Court has held that disputes over immigration policy are

particularly ill-suited for judicial review:

> For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government.  Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary.

*Mathews* v. *Diaz*, 426 U.S. 67, 81 (1976).  The Court has accordingly "'long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Fiallo* v. *Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy* v. *Mezei*, 345 U.S. 206, 210 (1953)).  And the Court has observed that in light of the need for flexibility in immigration policy, "[t]he reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by Congress or the President in the area of immigration and naturalization."  *Mathews*, 426 U.S. at 81-82 & n.21 (citing *Baker* v. *Carr*, 369 U.S. 186, 217 (1962)).

Plaintiff's claims implicate all these concerns.  He essentially asks the Court to displace the Secretary's judgment as to the appropriate allocation of limited enforcement resources and to impose a "zero tolerance" policy seeking enforcement action against every removable alien, without regard to resource constraints, the Executive Branch's enforcement priorities, the positive contributions an alien may have made to our society, or the humanitarian cost of deporting aliens with deep and longstanding ties to the United States.  Plaintiff asks the Court to ignore the potential

40

impact of such a policy on "trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Arizona*, 132 S. Ct. at 2498. And he invites the Court to override the Secretary's express statutory obligation to "[e]stablish[] national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). The suit, in short, poses a grave potential for judicial intrusion into matters that are "so exclusively entrusted to the political branches of the government as to be largely immune from judicial inquiry or interference." *Harisades* v. *Shaugnessy*, 342 U.S. 580, 589 (1952).

In addition, federalism concerns counsel strongly against entertaining suits by local government officials grounded on contentions that federal policy decisions in an area of exclusive federal control will have general, economic consequences within their locality. This Court, in considering a State's standing to sue in such circumstances, reasoned that "the unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union embodying a division of national and state powers suggest to us that impairment of state tax revenues should not, in general be recognized as sufficient injury in fact to support state standing." *Pennsylvania* v. *Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976). That principle applies *a fortiori* to county-level officials who do not, in the first instance, have any authority to represent their State's sovereign or quasi-sovereign interests in federal court.

There are countless ways in which any given federal action may have some indirect impact on a local government. If such incidental costs were, without more, a sufficient basis for standing, virtually every federal decision that had some financial impact on a locality could be challenged by local officials. That, in turn, would vitiate the principle that generalized grievances common to the public at large do not rise to the concrete and particularized injury necessary to invoke the jurisdiction of a federal court. And it would open the door to a multiplicity of suits that would interfere with functions that, like regulation of immigration, are the sole province of the federal government.

## II.    Plaintiff Has Not Demonstrated Likelihood Of Success On The Merits Or That The Balance Of Harms And Public Interest Warrant Issuance Of A Preliminary Injunction.

After concluding that it lacked jurisdiction, the district court went on to evaluate the standards for issuance of a preliminary injunction and concluded that plaintiff has not satisfied them. JA. 793-97. Thus, if the Court finds jurisdiction, it should review the district court's findings under the usual standards governing appellate review of preliminary injunction determinations: *de novo* review of plaintiff's probability of success on the merits and other issues of law, and abuse-of-discretion review of the district court's evaluation of the public interest and balance of harms. *Sherley*, 644 F.3d at 393.

Should it find jurisdiction and reach the issue, the Court should affirm the denial of a preliminary injunction under this standard of review. A

42

preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter* v. *Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.[5] *Id.* at 20. The plaintiff, moreover, as the moving party, has the burden of showing that all four factors weigh in favor of an injunction. *Abdullah* v. *Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014). The district court concluded that plaintiff has not discharged his burden with respect to any of these factors.

---

[5] It remains an open question within the Circuit as to whether the likelihood of success factor is an independent requirement or whether, in cases where the other three factors strongly favor an injunction, the plaintiff need demonstrate only a serious legal question on the merits. JA. 776, citing *Aamer* v. *Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). The Court, however, has in no instance approved issuance of an injunction in the absence of a strong showing of irreparable injury to the movant. *See Winter*, 555 U.S. at 22. Because plaintiff here cannot demonstrate such injury, the Court need not reach the issue of whether a lesser showing of likely success on the merits is sufficient if the other injunction factors are satisfied.

A.  <u>Plaintiff Has Not Demonstrated A Likelihood Of Success On The Merits</u>.

Plaintiff argues that the deferred enforcement action policies challenged are an unconstitutional usurpation of Congress's legislative authority, that they violate the President's constitutional duty to take care that the laws be faithfully executed, and that they were promulgated in violation of the notice and comment rulemaking requirement of the Administrative Procedure Act.  None of these legal contentions is likely to (or indeed could) succeed on the merits.

**1.**  Plaintiff has no cause of action to bring his statutory claims for two independent reasons.  First, an "agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion," *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985).  Plaintiff's claims all seek to overturn the agency's exercise of such prosecutorial discretion.  Under *Chaney*, such claims are presumptively unreviewable.  For the same reasons, judicial review of the exercise of enforcement discretion under the INA is precluded by law, 5 U.S.C. § 701(a)(1), and the prospect of judicial intrusion into a matter so closely tied to the protection of the Nation's borders and foreign relations provides compelling grounds for denying relief, 5 U.S.C. § 702.

Second, plaintiff is not within the "zone of interests" of any relevant provision of the INA, 8 U.S.C. § 1101 *et seq.*  The "essential inquiry" under the "zone of

44

interests" test is "whether Congress intended for a particular class of plaintiffs to be

relied upon to challenge" alleged violations of the specific statutory provisions they

seek to enforce. *Clarke* v. *Sec. Indus. Ass'n*, 479 U.S. 388, 398 (1987); *see also Lexmark*,

134 S. Ct. at 1387 (2014). Where, as in this case, the plaintiff is not himself the

subject of the contested regulatory action, "the test denies a right of review if the

plaintiff's interests are so marginally related to or inconsistent with the purposes of

the statute that it cannot reasonably be assumed that Congress intended to permit the

suit." *Clarke*, 479 U.S. at 400.

      Here, there is no hint in the INA that Congress intended to depart from the

general background rule that one cannot "contest the policies of the prosecuting

authority when he himself is neither prosecuted nor threatened with prosecution."

*Linda R.S.* 410 U.S. at 619; *see also Sure-Tan, Inc.*, 467 U.S. at 897 (same for

enforcement of the immigration law). Nor is there any indication that Congress

regarded any impact of federal immigration policies on local government services to

be within the zone of interests protected by the INA. *Fed'n for American Immigration

Reform*, 93 F.3d at 901 (D.C. Cir. 1996) (individual's interest in regional impact of

federal immigration policy on employment and governmental services not within

INA's zone of interest and therefore does not afford standing to sue under the APA).

The notion that Congress intended to give local sheriffs the authority to contest such

policies is particularly unlikely, given that Congress did not intend to permit States to

countermand decisions by the Executive Branch about whether it is "appropriate to

allow a foreign national to continue living in the United States." *Arizona*, 132 S. Ct. at 2505-06.

 **2.** Even if plaintiff could demonstrate a right to sue, his substantive claims are meritless.

 **a.** The deferred action guidelines do not exceed the Secretary's delegated statutory authority. The district court recognized that the Secretary's deferred action policies are in fact "consistent with, rather than contrary to, congressional policy." JA. 795. They are supported by the Secretary's express statutory authority to administer and enforce federal immigration law, 8 U.S.C. § 1103(a), his statutory obligation to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and longstanding, congressionally and judicially recognized administrative practice.

 **b.** Plaintiff further errs in asserting that the grant of work authorization to aliens approved for deferred action amounts to an impermissible establishment of a "vast regulatory benefits program," in excess of statutory authority. Appellant Br. at 24. As set forth above, Congress has expressly granted the Secretary discretion to determine which aliens are authorized to work in the United States. 8 U.S.C. § 1324a(h)(3). And DHS regulations provide that aliens who are granted deferred action may be authorized to work if there is economic necessity. 8 C.F.R. § 274a.12(c)(14). This regulation, which was promulgated through notice and comment rulemaking, has been in effect since 1981, 46 Fed. Reg. 25,079, 25,081 (1981), and

thus was already part of the regulatory framework when Congress enacted 8 U.S.C. §
1324a(h)(3) expressly to authorize the Secretary to grant work authorization. The
statutory and regulatory scheme for granting federal work authorization to aliens
whose removal has been deferred is thus firmly grounded in established law.

Congress subsequently demonstrated its approval of this longstanding
approach by expressly authorizing certain aliens to be accorded deferred action and
work authorization. *See* Pub. L. No. 107-56, § 423(b)(1) (certain relatives of lawful
permanent residents "may be eligible for deferred action and work authorization");
Pub. L. No. 108-136, § 1703(c)(1)(A), (d)(1) (certain immediate relatives "shall be
eligible for deferred action . . . and work authorization"); 8 U.S.C. §
1154(a)(1)(D)(i)(II), (IV) (certain children are "eligible for deferred action and work
authorization" ). Congress, in short, "has given the Executive Branch broad
discretion to determine when noncitizens may work." *Ariz. Dream Act Coalition*, 757
F.3d 1053, 1062 (9th Cir. 2014). The Secretary's exercise of that discretion is
consistent with the statute and does not usurp powers reserved to Congress.

**3.** Plaintiff's passing suggestion that the Secretary's deferred action policies
violate the Take Care Clause is equally meritless. Plaintiff's contention (Appellant Br.
at 22) that the challenged deferred action guidelines "are not prosecutorial discretion
but rewriting the statutes" reduces to an assertion that the Secretary is not complying
with the immigration laws. That is a statutory claim dressed in constitutional garb and
does not implicate the Take Care Clause in the first instance.

47

In any event, however pleaded, a challenge to an agency's decision not to undertake enforcement action is a challenge to a discretionary judgment regarding resource allocation and other factors that are not amenable to judicial oversight, and that are presumptively not subject to judicial review. *Chaney*, 470 U.S. at 831-33. That such discretionary decisions are challenged on constitutional in addition to statutory grounds does not give the reviewing court any greater ability to second guess the agency's enforcement priorities or resource allocation decisions, nor does it make such claims susceptible to judicial review. *See Texas*, 106 F.3d at 665 ("We are not aware of and have difficulty conceiving of any judicially discoverable standards for determining whether immigration control efforts by Congress are constitutionally adequate"); *New Jersey*, 91 F.3d at 470 (Decisions about enforcement of the immigration laws "are by their nature peculiarly appropriate for resolution by the political branches of government," in part because "there are no judicially discoverable and manageable standards for resolving them") (internal quotation and citation omitted).

Moreover, entertaining such suits would raise significant separation of powers concerns. The duty to "take care" that the laws are faithfully executed is assigned to the President himself. Supreme Court precedent makes clear that separation-of-powers principles safeguard this discretionary authority from unwarranted intrusion by the other branches. *See Free Ent. Fund* v. *Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3153-54 (2010) (Undue legislative restrictions on President's removal power

48

violate separation of powers by interfering with President's authority to take care that the laws are faithfully executed); *Franklin v. Massachusetts,* 505 U.S. 827, 788-789 (1992) (Scalia, J, concurring in part)(noting that *Mississippi v. Johnson,* 4 Wall. 475, 501 (1867), holds that the Court "has no jurisdiction of a bill to enjoin the President in the performance of his official duties"). Entertaining claims that the President has violated the Take Care Clause thus risks trenching on discretionary powers that are reserved to the President alone.

Even apart from these substantial justiciability concerns, plaintiff's suggestion that the Take Care Clause is violated whenever the Secretary declines to prosecute an immigration violation is obviously incorrect. "The power to decide when to investigate, and when to prosecute, lies at the *core* of the Executive's duty to see to the faithful execution of the laws . . . ." *Community for Creative Non-Violence* v. *Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986)(emphasis added); *United States* v. *Nixon*, 418 U.S. 683, 693, (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"); *accord United States* v. *Cox*, 342 F.2d 167, 171 (5th Cir. 1965) (en banc); *In re Aiken County*, 725 F.3d 255, 262-63 (D.C. Cir. 2013) (op. of Kavanaugh, J.). Prosecutorial discretion in the enforcement of the law is thus an integral part of the duty to take care that the laws are faithfully executed, not a violation of it.

Contrary to plaintiff's contention, Congress has not given the Secretary an inflexible mandate to bring enforcement actions against all violators of the

immigration laws.  Here, Congress has allocated to DHS the resources to remove only a fraction of the violators it finds in any given year and accordingly has vested the Secretary with broad authority to allocate DHS's limited resources in a manner that best ensures the achievement of national enforcement priorities.  Deferred action is an effective means of fulfilling those objectives and faithfully executing the immigration laws.  It allows DHS to recognize that, just as DHS will pursue the removal of some aliens during a period of time, it will not pursue the removal of others, including for humanitarian reasons.  *See Reno*, 525 U.S. at 483-484.  Rather than abdicating statutory responsibility to enforce the immigration laws, the Secretary's deferred action guidelines focus the agency's limited enforcement resources on removing aliens who threaten border security, public safety, or national security.  They are consistent with a longstanding, congressionally-recognized, administrative practice, as well as with Supreme Court precedents holding that the immigration statutes afford the Secretary broad discretion at every stage of the removal process.  *Ibid.*  Plaintiff is thus unlikely to prevail on any claim founded upon the Take Care Clause.

**4**.  Finally, plaintiff is unlikely to succeed on his claim that that the deferred action guidelines are invalid because they were not issued in compliance with the notice-and-comment rulemaking requirements of the Administrative Procedure Act.  The APA expressly exempts from its rulemaking requirement "general statements of policy."  5 U.S.C. § 553(b)(3)(A).  Such exempt policy statements include "statements

50

issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln* v. *Vigil*, 508 U.S. 182, 197 (1993) (citation omitted).  An agency's articulation of non-binding guidelines for the exercise of its prosecutorial discretion falls squarely within this exemption from rulemaking requirements.  *See Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013, 1017 (9th Cir. 1987) (INS guidelines for deferred enforcement action against immigration violators merely "inform[] the public concerning the agency's future . . . priorities for exercising its discretionary power" and are thus general policy statements exempt from notice-and-comment rulemaking); *American Hosp. Ass'n* v. *Bowen*, 834 F.3d 1037 (D.C. Cir. 1987) (Medicare criteria for determining whether government enforcement agents would review the quality and appropriateness of hospital services not subject to notice-and-comment rulemaking); *Brock* v. *Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537-38 (D.C. Cir. 1986) (non-binding guidance for exercise of agency's enforcement discretion not subject to notice-and-comment rulemaking); *accord United States Dep't of Labor* v. *Kast Metals Corp.*, 744 F.2d 1145, 1152-56 (5th Cir. 1984).

Citing *Morton v. Ruiz*, 415 U.S. 199, 232 (1974) and *Chamber of Commerce v. DOL*, 174 F.3d 206, 212 (D.C. Cir. 1999), plaintiff maintains that notice-and-comment rulemaking is nonetheless required here because the deferred action guidelines

establish binding eligibility criteria for an important agency benefit.[6] But that is not so, and those cases are readily distinguishable.

In *Morton*, the agency established binding eligibility criteria for the allocation of federal funds. And in *Chamber of Commerce*, the agency used the threat of enforcement action to coerce regulated parties into altering their primary conduct to comply with new, agency-established norms. *See id.*, 174 F.3d at 209-13. The Secretary's deferred action policies share none of these characteristics. Unlike the agency action in *Morton,* they do not establish binding substantive criteria for the allocation of a benefit. They are instead, by their express terms and in practice, explicitly non-binding. Moreover, they make clear that they confer no substantive entitlement to relief; that, even if the threshold criteria for seeking for deferred action are met, enforcement determinations are made at the Secretary's discretion; and that deferred action can be revoked at any time and enforcement instituted or re-instituted.

*Chamber of Commerce* is also not applicable here. Unlike the action challenged there, deferred action does use the threat of a sanction to coerce aliens into modifying their primary conduct. Indeed, its availability depends on events that happened in the past – such as date of entry or existing familial relationship -- that aliens cannot alter in the future. These policies do not have the force or effect of law, but instead simply help to prioritize the agency's limited enforcement resources. Plaintiff thus errs in

---

[6] As noted above, the regulation providing for the grant of work authorization to aliens who are the subject of deferred action was promulgated through notice-and-comment rulemaking.

asserting that these discretionary guidelines must be promulgated through notice and comment rulemaking.

In *Texas* v. *United States*, No. 15-254 (S.D. Tex. Feb. 16, 2005), a district court, contrary to these principles, recently concluded that the plaintiffs there were likely to succeed on their claim that the Secretary's 2014 DAPA and expanded DACA guidelines constitute a legislative rule requiring notice and comment. *Id.*, slip op. at 112. This decision, which is currently under appeal in the Fifth Circuit, is incorrect, unpersuasive, and distinguishable.

The district court in *Texas* concluded that States are within the "zone of interests" of the INA because "DAPA undermines the INA statutes enacted to protect the states." *Id.* at 36. As explained above, however, the States do not fall within the zone of interests protected by the INA. And in any event, plaintiff is a county sheriff, not a State, and cannot base an APA suit on the same interests as the *Texas* plaintiffs.

Moreover, the *Texas* court erred in concluding that the guidelines are binding on DHS. That conclusion is at odds with the Secretary's express pronouncements to the contrary and the district court's express finding here that the guidelines "retain provisions for meaningful case-by-case review." JA. 796. Indeed, the court below cited agency statistics demonstrating that deferred action had been denied after individual review in a substantial number of cases. JA. 796 n.13. Moreover, even if the policies here did not mandate that DHS agents engage in case-by-case review, the

53

policies would still not have the force or effect of law because they would still merely "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln*, 508 U.S. at 197.

> B.  Plaintiff's Vague And Conclusory Allegations Of Harm
> Do Not Establish Irreparable Injury.

The Court "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches* v. *England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The injury to the movant seeking a preliminary injunction "must be both certain and great," as well as "actual and not theoretical." *Wis. Gas Co. v. FERC.*, 758 F.2d 669, 674 (D.C. Cir. 1985). The movant must also "substantiate" its "claim that irreparable injury is 'likely' to occur" with appropriate factual evidence. *Id.* Failure to meet this "high standard" renders a plaintiff ineligible for preliminary injunctive relief, regardless of the remaining factors. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

The district court did not abuse its discretion in concluding that plaintiff had not demonstrated irreparable harm. The court pointed out that the plaintiff's inability to demonstrate a concrete and particularized injury for purposes of standing "likewise dooms the plaintiff's ability to show irreparable harm" to support a preliminary injunction motion. The court further noted that plaintiff's claim of an urgent irreparable injury was inconsistent with his delay in challenging the DACA policy, which has been in effect since 2012. JA. 793, 797.

Plaintiff argues that a colorable claim of "loss of constitutional freedoms" constitutes irreparable injury.  Appellant Br. at 32.  But plaintiff's abstract contentions that the Secretary's deferred action policies offend the Take Care Clause (*see* JA. 18) and intrude on Congress's legislative powers (JA. 19) do not implicate any individual right or freedom guaranteed to plaintiff by the Constitution, particularly when plaintiff is not complaining about any exercise of governmental authority over him.  *Cf. Mills* v. *District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (finding irreparable injury from police checkpoints that effected an allegedly unconstitutional seizure by restricting plaintiff's freedom to travel on public streets).  Rather, as shown above, plaintiff's claims involve a generalized grievance about federal immigration policy that is unmoored from any concrete and particularized injury to his individual interests.

C.  <u>The Harm To Third Parties, The Government, And The Public Interest Weigh Against Issuance Of A Preliminary Injunction</u>.

The district court did not abuse its discretion in concluding that the public interest and balance of equities do not support a preliminary injunction.  It reasoned that halting the challenged deferred action policies would impair the Secretary's ability to focus enforcement actions on protecting the border, national security, and public safety, and would upset the expectations of aliens who have benefited from deferred action policies.  JA. 797.

The district court's findings in this regard are well within its discretion.  The district court recognized that the challenged policies focus limited enforcement

55

resources on enhancing border security and removing aliens who have committed crimes or threaten national security or public safety.  An injunction would disrupt the Secretary's efforts to establish enforcement priorities, to allocate limited enforcement resources where they are needed most, and to temper enforcement priorities with consideration of the humanitarian costs of uprooting families with deep and longstanding ties to the United States.  All these factors weigh heavily against a preliminary injunction.

Plaintiff asserts that there is always a public interest in government adherence to a statutory mandate, and that aliens who have violated the immigration laws cannot be unduly burdened by their removal.  Appellant Br. at 34.  Deferred action, however, does not violate a statutory mandate.  It is a congressionally recognized, discretionary enforcement tool of long standing, one that is consistent with the Supreme Court's recognition that "[a]t each stage [of the removal process] the Executive has discretion to abandon the endeavor." *Reno,* 525 U.S. at 483-84.  And although aliens who are unlawfully present can claim no legal right to remain, it is disingenuous to suggest that there is no harm in disrupting families with deep ties to the United States or removing aliens who came here as children and know no other home.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

BENJAMIN C. MIZER
  Acting Assistant Attorney General

RONALD C. MACHEN JR.
  United States Attorney

BETH S. BRINKMANN
  Deputy Assistant Attorney  General

SCOTT R. MCINTOSH
  (202) 514-4042
  /s/ JEFFREY CLAIR
  (202) 514-4028
WILLIAM  E. HAVEMANN
  (202) 514-8877

  Attorneys, Civil Division
  Room 7243, Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C. 20530

57

**FRAP 32(a)(7) CERTIFICATE OF COMPLIANCE**

I certify that this brief has been prepared in Microsoft Word using a 14-point, proportionally spaced font, and that based on word processing software, the brief contains 13,982  words.

/s/ Jeffrey Clair

jeffrey.clair@usdoj.gov
(202) 514-4028

**CERTIFICATE OF SERVICE**

I certify that on March 2, 2015, I electronically filed the foregoing Brief for the Defendants-Appellees using the Court's CM/ECF system, which constitutes service under the Court's rules.

/s/ Jeffrey Clair

jeffrey.clair@usdoj.gov
(202) 514-4028

58